### BEECH-NUT PACKING CO. v. FEDERAL TRADE COMMISSION. *

(Circuit Court of Appeals, Second Circuit. February 26, 1920.)

No. 92.

**Trade-marks and trade-names ⚌80½, New, vol. 8A Key-No. Series—Manufacturer held not subject to order of Federal Trade Commission; "unfair method of competition."**

That a manufacturer of products sold in interstate commerce to jobbers and wholesale dealers, who in turn sell to other jobbers and wholesale and retail dealers, issues circulars to its trade suggesting prices for resale, both at wholesale and retail, and refuses to continue to sell to any dealer who fails to maintain such prices, or who sells to another dealer failing to maintain them, in the absence of contracts requiring adherence to such prices, *held* not to constitute an "unfair method of competition," in violation of Federal Trade Commission Act Sept. 26, 1914 (Comp. St. § 8836e).

Petition to Review Order of Federal Trade Commission.

Petition by the Beech-Nut Packing Company to review an order of the Federal Trade Commission. Order reversed.

Charles Wesley Dunn, of New York City (Charles E. Hughes, of New York City, of counsel), for petitioner.

Edward L. Smith, of Washington, D. C. (Claude R. Porter and Mar-

shall B. Clarke, both of Washington, D. C., and Joseph A. Burdeau, of New York City, of counsel), for respondent.

Before WARD, HOUGH, and MANTON, Circuit Judges.

WARD, Circuit Judge. April 15, 1918, the Federal Trade Commission issued a complaint against the Beech-Nut Packing Company under section 5 of the Act of Congress of September 26, 1914 (Comp. St. § 8836e), entitled "An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," charging the company with using an unfair method of competition in interstate commerce, viz. in selling its products to such purchasers, principally wholesalers and jobbers, as do not resell at a price lower than that fixed by the company and in refusing to sell to such as do, with the purpose of eliminating competition in the sale of the company's products and that a proceeding by the commission in respect to this method would be to the interest of the public.

The company appeared and answered, admitting these facts, but denying that it had entered into any agreement with purchasers requiring them to maintain its prices, or in any way qualifying their title to the articles purchased, or restricting their freedom to sell to any one and charge any price they choose.

An agreed statement of facts was filed. June 30, 1919, the commission filed its report and findings.

The respondent is engaged in interstate commerce in selling divers food products, such as sliced bacon, sliced beef, peanut butter, candies, chewing gum, etc., under the trade-name "Beech-Nut Brand." The commission's findings of fact are very long, and it will be sufficient for the purposes of our decision to state the following:

"Paragraph Four. That respondent customarily markets its products principally through jobbers and wholesalers in the grocery, drug, candy, and tobacco lines, who in turn resell to retailers in these lines, all of which wholesale and retail dealers are selected as desirable customers, for the reason that they are known or believed to be (a) of good credit standing; (b) willing to resell at the resale prices suggested by respondent and who do resell at such prices, as hereinafter set forth; (c) willing to refuse to sell and who do refuse to sell to jobbers, wholesalers and retailers who do not resell at the resale prices suggested by respondent, and who do not sell to such jobbers, wholesalers and retailers as also hereinafter set forth; (d) good and satisfactory merchandisers in other respects. Such jobbers, wholesalers, and retailers are designated by the respondent as 'selected' or 'desirable' dealers. Respondent also sells 'direct' in a few instances to certain large retailers, who are selected on the same basis as the aforesaid jobbers, wholesalers, and retailers. The total number of such dealers handling the products of respondent includes the greater proportion of the jobbers, wholesalers, and retailers, respectively, in the grocery trades and a large proportion of the jobbers, wholesalers, and retailers in the drug, candy, and tobacco trades, respectively, throughout the United States.

"Paragraph Five. That respondent, in the sale and distribution of its products, has adopted and maintained, and still maintains, policy known as the 'Beech-Nut Policy,' and requests the co-operation therein of all dealers selling the products manufactured by it, dealing with each customer separately."

"Paragraph Seven. In order to carry out said Beech-Nut policy and to secure such co-operation, respondent

"(a) Issues circulars, price lists and letters to the trade generally showing suggested uniform resale prices, both wholesale and retail, to be charged for Beech-Nut products.

"(b) Requests and insists that the aforesaid selected jobbers, wholesalers, and retailers resell only at the suggested resale prices.

"(c) Requests and insists that the aforesaid selected jobbers, wholesalers, and retailers sell only to such other jobbers, wholesalers, and retailers as have been and are willing to resell and do resell at the prices so suggested by the respondent, and requests and insists that such jobbers, wholesalers, and retailers discontinue selling to other jobbers, wholesalers, and retailers who fail to resell at the prices so suggested by respondent.

"(d) Makes it known broadcast to such selected jobbers, wholesalers and retailers, whether sold 'direct' or not, that if they, or any of them, fail to sell at the resale prices suggested by the respondent as aforesaid, respondent will absolutely refuse to sell further supplies of its products to them, or any of them, and will also absolutely refuse to sell any jobbers, wholesalers, and retailers whatsoever who sell to other jobbers, wholesalers, or retailers failing to resell at the prices suggested by respondent.

"Paragraph Eight. That respondent, in the carrying out of said policy

"(a) Has within the time aforementioned refused and does refuse to sell its products to practically all such jobbers, wholesalers, and retailers as do not resell at the prices so suggested by the respondent.

"(b) Has within the time aforementioned refused and does refuse to sell to practically all such jobbers, wholesalers, and retailers reselling to other jobbers, wholesalers, and retailers who have failed to resell at the prices so suggested by the respondent.

"(c) Has within the time aforementioned refused and does refuse to sell to practically all so-called mail-order houses engaged in interstate commerce, on the ground that such mail-order houses frequently sell at cut prices, and has within the time aforementioned refused and does refuse to sell to practically all jobbers, wholesalers, and retailers who sell its products to such mail-order houses.

"(d) Has within the time aforementioned refused and does refuse to sell to practically all so-called price cutters.

"(e) Has maintained within the time aforementioned and does maintain a large force of so-called specialty salesmen or representatives who call upon the retail trade and solicit orders therefrom to be filled through jobbers and wholesalers, which orders are commonly known in the trade as 'turnover 'orders'; that respondent's salesmen, under its instructions, have within the time aforementioned refused and do refuse to accept any such turnover orders to be filled through jobbers and wholesalers who themselves sell or have sold at less than the suggested resale prices, or sell or have sold to jobbers, wholesalers, and retailers who sell or have sold at less than such suggested resale prices, and in such cases have requested such retailers to name other jobbers.

"(f) Has within the time aforementioned reinstated and does reinstate as distributors of its products, jobbers, wholesalers, and retailers previously cut off or withdrawn from the list of selected jobbers, wholesalers, and retailers for failure to resell at the prices suggested by the respondent and/or for selling to distributors who do not maintain such suggested resale prices, upon the basis of declarations, assurances, statements, promises, and similar expressions, as the case may be, by said distributors, respectively, which satisfy the respondent that such distributors will thereafter resell at the prices suggested by the respondent and/or will refuse to sell to distributors who do not maintain such suggested resale prices.

"(g) Has within the time aforementioned added and does add to its list of new distributors concerns reported by its representatives as declaring that they intend to and will resell at the prices suggested by the respondent, and/or will refuse to sell to distributors who do not maintain such suggested resale prices.

"(h) Has within the time aforementioned utilized a system of key numbers or symbols stamped or marked upon the cases containing 'Beech-Nut Brand' products, thus enabling the respondent, for any purpose whatsoever, to ascertain the identity of the distributors from whom such products were purchased, and that repeatedly, within the time aforementioned, when instances of price cutting have been reported to respondent by the selected wholesalers and retailers, or ascertained in other ways, its salesmen and representatives have

been instructed by respondent to investigate, and that in pursuance of these instructions salesmen and representatives of respondent have by means of these key numbers or symbols traced the price cutters from whom the goods have been obtained, and have thus ascertained the identity of such price cutters, and have also thus traced and ascertained the identity of distributors from whom price cutters have purchased 'Beech-Nut Brand' products, and have thereafter refused to supply all such' dealers with its products, whether such dealers were themselves cutting the suggested resale prices or were selling to dealers cutting the suggested resale prices.

"(i) Has within the time aforementioned maintained and does maintain card records containing the names of thousands of jobbing, wholesale, and retail distributors, including the aforesaid selected distributors, and in furtherance of its refusals to sell goods either to distributors selling at less than the suggested resale price, or to distributors selling to other distributors selling at less than the suggested resale prices, has listed upon those cards bearing the names of such distributors, the words 'Undesirable—Price Cutters,' 'Do Not Sell,' or 'D.N.S.,' the abbreviation for 'Do Not Sell,' or expressions of a like character, to indicate that the particular distributor was not, in the future, to be supplied with respondent's goods, on account of failure to maintain the aforesaid suggested resale prices, or on account of failure to discontinue selling to dealers failing to maintain such suggested resale prices. When respondent has received declarations, assurances, statements, promises, and similar expressions, as the case may be, by said distributors, respectively, which satisfy the respondent that such distributors will resell at the prices suggested by the respondent, and/or discontinue selling to distributors failing to maintain the resale prices suggested by respondent, said respondent has issued instructions to 'Clear the Record,' or directions of similar import, notation of which is made on the cards, and has thereafter permitted shipments of its products to be made to such distributors, and such distributors to whom shipments are thus allowed to go forward constitute the respondent's list of so-called 'selected' jobbers, wholesalers, and retailers, and no distributor is thus listed on such card records as one to whom goods are allowed to go forward who fails to maintain the resale prices suggested by respondent or sells to distributors failing to resell at such suggested prices; and when a jobber, wholesaler, or retailer is reported as failing to maintain the suggested resale prices, and/or as selling to distributors who fail to maintain such suggested resale prices, and has been entered in the card records as one to whom shipments should not go forward, respondent notifies those jobbers, wholesalers, and retailers who supply said distributor of this fact, and also notifies its specialty salesmen, and gives similar notices to said jobbers, wholesalers, and retailers, and to its specialty salesmen, when reinstatements are made in its said list of 'selected' jobbers, wholesalers, and retailers."

### The commission's conclusion of law is:

"That the methods of competition set forth in the foregoing findings are, under the circumstances therein set forth, unfair methods of competition in interstate commerce, in violation of the provisions of an act of Congress approved September 26, 1914, entitled 'An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes.'"

### June 30, 1919, the order under review issued as follows:

"Now, therefore, it is ordered that respondent, Beech-Nut Packing Company, its officers, directors, agents, servants, and employés, cease and desist from directly or indirectly recommending, requiring, or by any means bringing about the resale of Beech-Nut products by distributors, whether at wholesale or retail, according to any system of prices fixed or established by respondent, and more particularly by any or all of the following means:

"1. Refusing to sell to any such distributors because of their failure to adhere to any such system of resale prices.

"2. Refusing to sell to any such distributors because of their having resold respondent's said products to other distributors who have failed to adhere to any such system of resale prices.

"3. Securing or seeking to secure the co-operation of its distributors in maintaining or enforcing any such system of resale prices.

"4. Carrying out or causing others to carry out a resale price maintenance policy by any other means."

The subject is one affecting the public generally, and plainly within the jurisdiction of the commission. The ground upon which the conclusion of law rests is that the method is unfair, because it stifles competition and so restrains trade. The obvious purpose of the respondent is to prevent any competition as to the resale price between purchasers of its products. Such a method, founded upon an agreement between a manufacturer and purchasers severally, was held to be a violation of the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) in Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502. It is difficult to say why a different conclusion should be reached, if the same result is attained by acquiescence and co-operation without express agreement between the manufacturer and his purchasers severally. Eastern States Retail Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788. But we understand the Supreme Court to hold in United States v. Colgate & Co., 250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992, that a similar, but less drastic, method of sale constitutes merely the exercise of a man's right to do what he will with his own, and is not obnoxious to the Sherman Act.

The facts as found by the commission, being supported by testimony, are conclusive; but the effect of them is a question of law, to be expressed in a conclusion of law, and the commission so describes it. We do not see how this conclusion can be sustained, in face of the decision in the Colgate Case.

The order is reversed.

MANTON, Circuit Judge (concurring). I concur in the result here announced, and will state my reasons:

In considering the cases which arise under the jurisdiction of the Federal Trade Commission, the distinction between the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209) and the act which creates and defines the jurisdiction and duties of the Federal Trade Commission (Act Cong. Sept. 26, 1914, c. 315, § 5, 38 Stat. 719) must be kept in mind. The purposes of the Sherman Act and of the Federal Trade Commission Act are different. The Sherman Act is intended for the prohibition of contracts and combinations in restraint of trade which are of sufficient force of oppression or coercion as amount to a monopoly or trust. In order for the government to succeed in an equity or criminal action, or for a private litigant to succeed, where he seeks damages as a result of such alleged trust or combination, each must successfully bear the burden of establishing a combination which restrains trade. No such obligation is imposed upon the Federal Trade Commission before its order may issue requiring an individual, partnership, or corporation engaged in commerce to desist from a practice which might lead eventually to an unlawful trust or combination which would be in restraint of trade. Section 5 of the Federal Trade Act

prohibits unfair methods of competition in commerce, declaring them unlawful. This act forbids all unfair methods of competition. It does not define what is unfair competition, but leaves that to the commission for determination. Section 5 provides that the commission is empowered and directed to prevent persons, partnerships, or corporations, except banks and common carriers subject to the acts to regulate commerce, by using methods of unfair competition in commerce. It will thus be observed that there is no restriction or qualification to the powers thus conferred, but the method of commerce must be unfair.

This legislation appears to be analogous to that provided for in the creation of the Interstate Commerce Commission. The Interstate Commerce Act (24 Stat. 379) conferred the powers upon the commission to enforce any order or orders provided in the act that it might issue, and it gives to the Interstate Commerce Commission the power to issue an order to cease and desist a violation. B. & O. R. Co. v. Pitcairn Coal Co., 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292. The Interstate Commerce Commission was created for the purpose of receiving and correcting any abuse or injustice perpetrated upon shippers by railroads or injustice to the railroads. What were reasonable rates was to be determined by the commission. It was held by the Supreme Court, with respect to enjoining or setting aside the orders of the commission by the federal courts, that authority of the courts, in reviewing their determination, was confined to whether there had been violations of the Constitution or of the power conferred by statute or any exercise of power so arbitrary as to virtually transcend the authority conferred. Kansas City Ry. Co. v. United States, 231 U. S. 423, 34 Sup. Ct. 125, 58 L. Ed. 296, 52 L. R. A. (N. S.) 1; Interstate Commerce Comm. v. L. & N. Ry. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431. The Federal Trade Commission Act provides that when an order is made, and it is based upon a finding of unfair competition supported by evidence, it is conclusive upon the courts, and this court so held in Federal Trade Commission v. Gratz, 258 Fed. 314, 169 C. C. A. 330.

In my opinion, Congress had in mind, in this legislation, the prevention of acts which amount to unfair competition at their very inception. In this manner, the Anti-Trust Law was supplemented. To make successful either a criminal prosecution or other liability under the Sherman Act, it is necessary to find that a trust or monopoly is created which restrains trade. One act which may be an act of unfair competition may, of itself, restrain trade and may do damage to a complainant. The Federal Trade Commission Act was intended to reach such an unfair business method where the Anti-Trust Law could not do so. Of course, if all unfair acts were dealt with by the Federal Trade Commission, there would be no monopoly or trust created. It was intended by section 5 of the act to prevent practices or methods of business unfair to the public which, if not prevented, would grow and create monopolies, and thus restrain trade and lessen competition. In the case of Dr. Miles Medical Co. v. Park & Son (220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502) the Supreme Court

held that where the defendant successfully prevented competition by fixing resale prices between purchasers of the products of the defendant, this amounted to a restraint of trade and was a violation of the Sherman Anti-Trust Act of July 2, 1890. The only difference between the price fixing of the Dr. Miles Case and the price fixing in the "Beech-Nut merchandising policy," which the Federal Trade Commission in the case at bar has found offensive as an unfair method of competition, is that in the former case there was an agreement in writing provided for, while in the latter the success or failure of the plan depended upon a tacit understanding with the purchasers and prospective purchasers. It is difficult to see any difference between a written agreement and a tacit understanding. In each case, if the agreement, written or unwritten, is not lived up to, it means that the prospective purchaser could not buy or obtain the goods he wished. This may of itself create a restraint of trade. In the case of Boston Store v. American Graphophone Co., 246 U. S. 8, 20, 21, 38 Sup. Ct. 257, 259 (62 L. Ed. 551, Ann. Cas. 1918C, 447), speaking of the Dr. Miles Case, the court said:

"It was decided that under the general law the owner of movables (in that case, proprietary medicines compounded by a secret formula) could not sell the movables and lawfully by contract fix a price at which the product should afterward be sold, because to do so would be at one and the same time to sell and retain, to part with and yet to hold, to project the will of the seller, so as to cause it to control the movable parted with when it was not subject to his will, because owned by another, and thus to make the will of the seller unwarrantedly take the place of the law of the land as to such movables. It was decided that the power to make the limitation as to price for the future could not be exerted consistently with the prohibitions against restraint of trade and monopoly contained in the Anti-Trust Law."

In the plan of the petitioner herein, called a "suggestion," which in truth is a tacit understanding, to do precisely what was done in the Dr. Miles Case, disobedience of the "suggestion" would result in a failure to be able to buy further from the petitioner. It has been held that the trader or manufacturer who carries on an entirely private business may sell to whom he pleases. U. S. v. Trans-Missouri Freight Assn., 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007. And this case was approved in United States v. Colgate, 250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992. However, in the Colgate Case, the court dealt solely with the purpose of the Anti-Trust Act in its prohibition of monopolies, contracts, and combinations which interfere with the free exercise of the rights of a merchant to engage in trade and commerce. The court said that, in the absence of any purpose to create or maintain a monopoly, the act does not restrict the right of a trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal. It distinguishes the Dr. Miles Case for the reason that it was found in this case there existed an unlawful combination which was effected through contracts which undertook to prevent dealers from freely exercising the right to sell. Referring to the facts in the Colgate Case, the court said:

"Considering all said in the opinion[1] (notwithstanding some serious doubts), we are unable to accept the construction placed upon it by the government. We cannot, e. g., wholly disregard the statement that 'the retailer, after buying, could, if he chose, give away his purchase or sell it at any price he saw fit, or not sell it at all; his course in these respects being affected only by the fact that he might by his action incur the displeasure of the manufacturer who could refuse to make further sales to him, as he had the undoubted right to do.' And we must conclude that, as interpreted below, the indictment does not charge Colgate & Co. with selling its products to dealers under agreements which obligated the latter not to resell except at prices fixed by the company."

In view of this recent pronouncement in the Colgate Case, and even accepting the finding of facts of the commission, I think we are forced to the conclusion that the acts found and charged in the method of doing business under the "Beech-Nut merchandising policy" are not unfair methods of competition, and that therefore this court must hold, as a matter of law, that the commission exceeded its power in making the order appealed from.