## TOLEDO PIPE–THREADING MACH. CO. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Sixth Circuit. March 13, 1926.)

No. 4355.

1. **Trade-marks and trade-names and unfair competition** ⬦�ண80½, New vol. 8A Key-No. Series—**Order of Federal Trade Commission requiring tool manufacturer to desist from specific practices designed to control price to consumers held valid.**

Order of Federal Trade Commission requiring tool manufacturer, endeavoring to control prices to consumer, to desist from practice of (1) requiring dealers to give assurance that they would be governed by suggested resale discounts from list prices, (2) requiring dealers placing order to give assurance that resale discounts would be followed as condition precedent to acceptance of order, and (3) requiring from dealers generally assurance that they would be governed by resale discounts under threat of discontinuance of relations, *held* valid.

2. **Trade-marks and trade-names and unfair competition** ⬦➣80½, New, vol. 8A Key-No. Series—**Order of Federal Trade Commission requiring tool manufacturer to desist from practice of seeking co-operation of dealers in making effective a resale price maintenance policy held invalid.**

Order of Federal Trade Commission requiring tool manufacturer, endeavoring to control prices to consumer, to desist from practice of seeking co-operation of dealers in making effective resale price maintenance policy (1) by seeking advice of dealers as to location of selling territorial division line for purpose of eliminating price competition among dealers (2) by manifesting to dealers an intention to act on all reports of price cutting (3) by informing dealers that price cutters reported had or would be refused further sales (4) by employing salesmen to investigate charges of price-cutting reported and advising dealers of that fact, *held* invalid in view of manufacturers' absolute right to refuse to sell to any dealer who would not maintain suggested schedule.

3. **Monopolies** ⬦➣17(1)—**Competition between jobbers of same proprietary or patented article is within protection of Sherman Act against restraint by contract (Comp. St. § 8820 et seq.).**

Competition which may exist between jobbers of same proprietary or patented article is within class protected by Sherman Act (Comp. St. § 8820 et seq.) against restraint by contract, and system of express price maintenance contracts is direct restriction of competition forbidden by that act.

4. **Trade-marks and trade-names and unfair competition** ⬦➣80½, New, vol. 8A Key-No. Series—**Express finding of public interest by Federal Trade Commission, ordering manufacturer to desist from invalid price maintenance methods, is unnecessary.**

Express finding of public interest by Federal Trade Commission is not essential to validity of order directing tool manufacturer to desist from practices calculated to eliminate competition among jobbers, and to maintain fixed price to consumers, since in such case public interest follows, as matter of law, a finding of invalid price maintenance methods.

5. **Trade-marks and trade-names and unfair competition** ⬦➣80½, New, vol. 8A Key-No. Series.

Manufacturer's restraint of competition between jobbers to maintain fixed price to consumers *held* of sufficient magnitude to justify action of Federal Trade Commission.

Petition to Review an Order of the Federal Trade Commission.

Petition by the Toledo Pipe-Threading Machine Company to review and vacate an order of the Federal Trade Commission requiring petitioner to desist from carrying on a system of price maintenance. Order affirmed in part, and vacated in part.

See, also, 6 F.(2d) 876.

George P. Hahn, of Toledo, Ohio (Brown, Hahn & Sanger, of Toledo, Ohio, on the brief), for petitioner.

Alfred M. Craven, of Washington, D. C. (Adrien F. Busick, of Washington, D. C., on the brief), for respondent.

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. This is a petition to vacate the respondent's order to cease and desist from carrying on a system of price maintenance. From the record we summarize what we think are the relevant facts:

Petitioner is a long-established manufacturer of tools and appliances for pipe threading. The ultimate users of these products are largely plumbers and pipe fitters. It sells these articles to retail dealers, who thereby become its distributors. There is no general class of wholesalers or jobbers coming between the manufacturer and the retailer, but a slightly less price is made to dealers who carry the tools in stock to a specified amount. Its tools have a high reputation and an established market among users, and are known as "Toledo tools." It makes sales through general advertising, circularizing, and by traveling salesmen.

In 1902 it adopted a scale of retail prices which it thought proper for its distributors to charge, and a scale of discounts which it would allow to its distributors for their profit. This was evidenced by a price list, showing, not actual prices, but an arbitrary list, so that current variations could be made by changing only the discount; for example, a tool was listed as $50, less a dis-

11 F.(2d)—22

count of 40 and 20 to the stock-carrying dealer, 40 and 10 to the smaller dealer, and 40 to the user. Petitioner's business is substantial, although not of great volume as compared with many national products. The annual sales are about $1,000,000, and the number of retailers from 1,000 to 1,200.

The Commission made, as its findings, certain extracts from or recitals of the undisputed testimony, and then "arrived at the following conclusions of fact [in which the present petitioner is termed the respondent]:

"(1) The selling policy of the respondent is based upon the use of a base list price, with discounts therefrom, by which are fixed the prices to the jobbers, and through the jobbers to the consumers.

"(2) That the respondent divides the territory of the United States into two selling districts, in which different resale discounts to the consumer are established, for the purpose of assisting to equalize freight differences favoring the eastern territory.

"(3) That the respondent established this line as the Mississippi river in 1920, and moved it west to the Colorado line in 1922, making the readjustment for the purpose of eliminating, so far as possible, a variation in resale discounts in the western territory.

"(4) That in locating this line for this purpose the respondent sought and received advice from dealers in the territory affected.

"(5) That it was the policy of the respondent to take notice of every report from a jobber or dealer of variations from the resale discounts, to make the reporting jobbers or dealers understand that the respondent welcomed such reports, and would enforce its resale price schedule by refusing further sales to the offending dealer, if he could be located. That the respondent urged dealers or jobbers making indefinite reports of price cutting to conduct investigations to determine the identity of the price cutter, and to report such price cutter to the respondent, so that the dealers of the respondent well understood that it was the policy of the respondent to receive reports from its dealers, and to refuse further sales to confirmed price cutters. That the respondent, becoming aware of the identity of a price cutter, refused further relations with such price cutter unless it appeared that the price variation was due to an excusable error, or the respondent received from the offending dealer a definite and positive assurance in writing, applicable both to sales already made and such sales as might be consummated in the future, that the respondent's resale discount schedule would be absolutely maintained. That upon a number of occasions the respondent had insisted upon and received such assurances from dealers or jobbers who had varied from the resale discount schedule.

"(6) That whenever, in the opinion of the respondent, it was necessary so to do, either because of the appearance of a considerable departure from the use of the resale discount schedule or because the price cutters could not be identified, the respondent, both for the purpose of ascertaining the identity of the price cutters and for the purpose of receiving renewed assurances from its dealers in the affected territory as to resale price maintenance, issued a circular bulletin or form letter to all of its dealers in the affected territory, calling attention to the policy of the respondent for the maintenance of its resale discount schedules, and in effect calling upon each dealer to acknowledge the receipt of the bulletin, circular, or letter in question, and to give in writing assurances, operative both as to sales already consummated and applicable to stock in the dealer's hands, as well as to sales not yet consummated, that the dealer would adhere strictly to the respondent's schedule to resale discounts, upon the penalty stated that the respondent would refuse business relations with any jobber or dealer who failed to maintain the respondent's suggested resale prices.

"(7) That this practice was followed with reference to all dealers in the western territory on one occasion, and another time with reference to all dealers in the Pittsburgh territory, again with reference to all dealers in the Los Angeles territory, and again with reference to all dealers in the Baltimore territory.

"(8) That in each instance of individual price cutting reported to the respondent, where the respondent could learn the identity of the price cutter, if the price variation was not satisfactorily explained to the respondent as a mistake, and the dealer in question refused to give assurances in writing, applicable both to his stock in hand representing consummated sales and to future sales as well, that he would be governed by the respondent's suggested resale price, the respondent refused further sales to such dealer.

"(9) That the respondent sought and secured the co-operation of its dealers in dividing its territory for the purpose of a variation in resale discounts, in order that

the location of the dividing line might be a practical means of eliminating variations from the resale discounts operative in each territory. That the respondent sought the co-operation of its dealers in making reports of price cutters, thereby enabling the respondent to eliminate willful price cutters from its list of dealers. That the respondent, whenever it deemed necessary, exacted from its dealers a written assurance that such dealers would, both with reference to consummated sales and sales not yet consummated, co-operate with the respondent in the maintenance of its resale prices."

These conclusions, in general and in many particulars, are not criticized; but the statements, in conclusion 6 that respondent issued certain letters or bulletins "in effect calling upon," etc., and in conclusion 9 that respondent "exacted from its dealers a written assurance," have no basis in the testimony, except as such inference is justified by letters of which typical specimens are given in the margin.[1]

To these conclusions there should be added certain negative facts, which may be of importance and which are according to the undisputed proofs. They are:

Petitioner has no system of express contracts with its dealers to maintain prices or to report price cutting, and no such contracts at all, except in those instances where the petitioner's complaint of price cutting has brought assurances like the sample letter. Petitioner employs no travelers to hunt down price cutting, and has no system of identifying marks by which it can be told what dealer sold a particular tool; but traveling salesmen naturally and commonly report instances of which they are informed. There is no system by which price-maintaining dealers co-operate with petitioner and with each other to exercise any kind of pressure upon the price-cutting dealer, save only as it is common in such cases to complain to petitioner, and to expect it to carry out its announced plan of refusing to sell to those who continue to cut. Petitioner has no system of taking orders from the consumers and turning these orders over to the price-maintaining dealers. Petitioner does absolutely refuse to make further sales to an unrepentant price-cutting dealer; but there is no system of co-operation or of effort to prevent that dealer from buying the tools from other dealers, nor any entry of that dealer's name upon a "do not sell" list and publication of such list among petitioner's trade.

_____
[1] See note at end of opinion.

In a letter from the petitioner to the Commission, the petitioner states its past and present policy upon this subject, in part as follows:

"(3) From the very inception of our business, some 20 years ago, three fundamental lines of action were determined upon: First, the establishing of definite prices for our products to the consumer; second, to market the product through the well-established jobbers and dealers of the country; third, to see to it that the jobbers and dealers uniformly used the prices established by us for the consumer. The organizers of the business were men of mature experience, and the policy above outlined was decided upon, because a reasonable price effective to all alike in any given community was fair and equitable, and the widest possible distribution could be obtained at the lowest sales or overhead expense by utilizing the well-established dealer organizations of the country.

"(4) Always pursuing the same policy, the business has grown until there are now approximately 1,200 dealers in the United States, carrying our tools in stock, subject to the demand of the ultimate consumer. It has been our job to constantly widen the source of supply, and to keep these sources actively interested along the lines laid down by ourselves, so that the public would be satisfied. In our experience has been included requests for exclusive agency arrangements, limiting our distribution to one jobber in a community, suggestions that we increase the selling price abnormally, and demands for larger percentages of profit for the dealer. To such requests and demands we have always turned a deaf ear. We are still pursuing the policy of fixing a reasonable price for the consumer, and a reasonable percentage beyond this for the distributor, and are insisting that the distributor shall maintain these prices.

"(5) A policy predicated on a jobbers' and dealers' price, and stopping there, would not, we believe, have proven successful in our business. In that event there would have been as many ideas as to what the consumer ought to be charged as there were dealers. Some would have started with a 50 per cent. margin of profit, or even more than this. But gradually quotations to the consumer would have been lessened by competitive quotations until, as has been the experience in some other lines, the dealers' interest would have ceased, and one after another they would have neglected to carry the tools in stock or advocate their purchase;

they would have devoted their attention to something new, from which the glamour had not as yet been rubbed off, because, when all is said and done, a business connection is only maintained as long as it is profitable. On the other hand, we affirm most positively that by fixing a consumers' price, and co-ordinating the thousands of minds making up our dealer connections, to use that price, we clarify the whole situation, we free the matter from doubt, we maintain the interest of the distributor, and we have paved the way for the widest possible distribution."

The Commission's order directed the respondent to "cease and desist" from maintaining its suggested resale discounts by

"(1) Requiring from dealers assurance that they will be governed by the suggested resale discounts in the disposal of stocks previously purchased, as a condition precedent to subsequent sales to them by respondent.

"(2) Requiring from dealers placing orders assurances that the commodities so ordered will be resold at the suggested resale discounts as a condition precedent to the acceptance of such orders.

"(3) Requiring from dealers generally assurances that they will be governed by the suggested resale discounts in all resales of respondent's products, under threat of discontinuance of relations.

"(4) Seeking the co-operation of dealers in making effective a resale price maintenance policy (1) by seeking the advice of dealers as to the location of a selling territorial division line for the stated purpose of eliminating price competition among dealers; (2) by manifesting to dealers an intention to act upon all reports sent in by them of variations from the resale discounts by the elimination of the price cutter; (3) by informing dealers that price cutters reported, who would not give assurance of adherence to the suggested resale discounts, had been or would be refused further sales; (4) by employing its salesman to investigate charges of price cutting reported by dealers and advising dealers of that fact, by which means, consecutively or concurrently applied, the aid and assistance of dealers is sought and obtained in the prevention of departures from respondent's resale discounts."

[1, 2] The state of the law as to price maintenance may rightly be said to be in confusion.[2] In Dr. Miles Medical Co. v. John D.

Park & Sons Co., 31 S. Ct. 376, 220 U. S. 373, 55 L. Ed. 502, the court had a case where the maintenance was effected by express contracts between the manufacturer and the jobber, and where the manufacturer had appealed to a court of equity for its aid in enforcing specific performance. The case involved two aspects, which might have been treated quite separately. It was a common-law principle that restraint of alienation was generally against public policy, and that the grantor could enforce against the grantee a covenant in such restraint only when it was reasonably pertinent to the grantor's interest in the sale. In this aspect, the question, therefore, was whether the agreement as to resale prices was reasonably necessary for the seller's protection. The other aspect had to do with competition. Since it is clear—as it is with every proprietary article—that no one else but the manufacturer can make the article, and that he may be as arbitrary as he pleases in selecting his customers; or, indeed, in making or selling it at all, it is clear that no question of competition, as between the manufacturer and makers of other articles which might be "equally as good," can be of any importance; but as between the jobbers of the article, who buy from the manufacturer, there may be competition for the business of the retailer or consumer. In this way the public interest in preserving competition may be involved, and so the Sherman Act (Comp. St. § 8820 et seq.) might be invoked.

[3] The court might have interpreted this opinion as dependent essentially upon the rules of specific performance in equity, or upon the principles of restraint of alienation; but it has not done so. In the present state of the decisions and in spite of the adverse comments of Mr. Justice Holmes in the case itself, and by the minority in the Schrader Case, 40 S. Ct. 251, 252 U. S. 85, 64 L. Ed. 471, we think we must treat the case as holding that the competition which may exist between the jobbers of the same proprietary or patented article is within the class of competition which is protected by the Sherman Act against restraint by contract, and that a system of express price maintenance contracts is inherently such a substantial and direct restriction of competition as to be forbidden by that law.

In the Colgate Case, 39 S. Ct. 465, 250 U. S. 300, 63 L. Ed. 992, 7 A. L. R. 443, there was a system of price maintenance similar in ultimate purpose, but its means of enforcement were limited to the cessation of

[2] See rather complete review in pages 287-300 of Henderson's Federal Trade Commission, a study for the Legal Research Committee of the Commonwealth Fund, Yale Press, 1924. See, also, 19 Michigan Law Review, p. 265, and 24 Michigan Law Review, p. 709.

business with the offender, and no system of express contracts existed. As thus declared and executed, it was held to be lawful. Since every such system as described in the Colgate Case becomes well known to all concerned, and since every jobber who buys knows that his right to reorder is dependent upon his observance of the schedule, and since any distinction between a contract that the jobber will maintain prices and an understanding that he will suffer a penalty if he does not is not strikingly apparent, it was thought by District Judge Westenhaver, as well as by the Second Circuit Court of Appeals (Beech-Nut Case, 264 F. 885, 888), that the Park Case was, at least in large degree, overruled by the Colgate Case. However, upon appeal from Judge Westenhaver's decision in the Schrader Case ([D. C.] 264 F. 175), the Supreme Court held otherwise, and the distinction between contract regulations of conduct and mere implications as to probable conduct, was pointed out. 40 S. Ct. 251, 252 U. S. 85, 64 L. Ed. 471.

Just where the line would be between a system of operation which was the equivalent of the forbidden contracts, and a system which might accomplish substantially the same result in another way, was not involved and was not considered. The principles which mark that line must be found, if anywhere, in the Beech-Nut Case, 42 S. Ct. 150, 257 U. S. 441, 66 L. Ed. 307, 19 A. L. R. 882. Here again the minority of the court seems to doubt whether there is in this kind of a situation any of that tendency to monopoly or restraint of trade which the Sherman Act forbids; but the court in effect, if not expressly, reconstrued and applied the Park Case as covering the very point, although the absolute right of the manufacturer to put out his schedule of retail prices, and to refuse to sell to any one who would not maintain it, was reaffirmed.

Whatever is said in the discussion found in the opinion, it would seem that the order which was directed in substitution for the Commission's order is the most careful formulation by the court of those elements of the Beech-Nut Company's conduct which it condemned. Whether it intended its condemnation to go to any one of the elements separately, or only to the combination of them all, may not be clear, though the use of the disjunctive "or" would indicate the former. These elements are: (1) The practice of reporting the names of price cutters. (2) Refusing to sell further to them unless they agree to maintain prices. (3) Employing salesmen who report price-cutting dealers, and who take orders from retailers and transfer those orders only to jobbers who observe the rules. (4) Employing a system of identifying marks, by which goods sold at cut prices could be traced back to the responsible dealers. It is to be noted, also, that these four elements were not condemned, except when combined with each other, and then only when they constituted a co-operative method, employed by the manufacturer and its distributors, customers, and agents, to keep others from getting the company's goods at less than the stated prices. Page 445 (42 S. Ct. 150).

Federal Trade Commission v. Raymond-Clark Co., 43 S. Ct. 93, 260 U. S. 716, 67 L. Ed. 478, was not a price-maintenance case, but it did involve and declare again the absolute right of a trader not to trade against his will, approving the Colgate Case. The opinion is probably helpful here, in that it emphasizes a concert of action among several to constrain another as being the feature distinguishing between the permitted and the forbidden.

The two recent price-maintenance cases in the Second and Ninth Circuit Courts of Appeals (American Tobacco Co. v. F. T. C., 9 F.(2d) 570, Oct. 20, 1925, and Hills Bros. v. F. T. C., 9 F.(2d) 481, January 4, 1926), although distinguishable in details, appear to us fundamentally in conflict with each other. It would seem that the Tobacco Company and the Wholesale Association exercised a concert of action to constrain the price cutters, at least as much as did the petitioner, the Toledo Company, and its distributors in the present case. The discussion by Judge Rogers of the controlling decisions and principles would support the conclusion that the practices of the Toledo Company are lawful. In the Hills Bros. Case, the co-operation between petitioner and its customers was no more in kind, though probably greater in amount, than we have here, and the opinion of Judge Rudkin concludes that this kind of co-operation is the thing forbidden by the rule of the Beech-Nut Case.

Coming to compare the present with the Colgate and the Beech-Nut Cases respectively: The elements involved in carrying out the price-maintenance scheme of the Colgate Company, as described in that indictment, are indistinguishable from the methods used by the Toledo Company, excepting as the Colgate Company went further; but this parallel does not control, because the conclusion or

inference that these things did not amount to a system of co-operation between the manufacturer and its distributors to constrain the price cutters, was the inference of the District Judge and not of the Supreme Court.

The Beech-Nut Case is not completely parallel, because in the present case we have no system of identifying marks, and no group of salesmen or agents engaged chiefly in finding and reporting violations, or at all in penalizing offenders by diverting from them the retail business, nor yet the elaborate plan of "do not sell" lists, with the accompanying co-operative effort to prevent other dealers from selling to the price cutters. We do have the general and encouraged practice by dealers to report, as far as they happen to develop, the names of price cutters and we do have the general practice of refusal by the manufacturer to sell to them further unless they agree to maintain the schedule. Whether these things amount to such "co-operative methods" between the manufacturer and the dealers as the court refers to in the Beech-Nut Case, or are merely a refusal to sell to price cutters, enforced by what so far as has been pointed out is the only available method, is not clear.

It is settled that the seller may rightfully say to the price cutter, "I have cut you off from my list, and I will sell you no more." There seems no reason why this exclusion must be permanent, nor is it obvious that any principle of public policy requires the price cutter to be forever barred from handling these goods. Yet the difference between his express promise to observe the price hereafter and the implied promise which he quite obviously makes to the same effect, if he asks the acceptance of a further order, is not a sharp distinction. It may be that ultimately either the principle that price maintenance is an evil, and may not be accomplished in any manner, or the principle that such a system may be established and enforced in any non-oppressive way, will clearly prevail. At present, we are better satisfied to think that the facts of this case establish enough of contract and enough of co-operation to bring it, in some aspects, within the Beech-Nut rule.

As to paragraphs 1, 2, and 3 of the order to cease and desist, there is room to think that the requirement of promises from price cutters, and the assurances in a number of cases received from them, go far enough so that they constitute a system of co-operative effort not protected by the manufacturer's individual right of arbitrary selection of customers, and, though with hesitation, we accept that view. As to paragraph 4, we note that subdivision 1 relates to a plan, abandoned three years before, and, so far as we see, never pertinent to the issue, while subdivisions 2, 3, and 4 specify acts which seem to us to be of necessity reasonably incidental to the fair exercise of this right of selection. They represent the irreducible minimum of means by which one who adopts the policy of not selling his goods to price cutters may endeavor to maintain that policy, and they indicate only that inevitable degree of "co-operation" naturally and selfishly coming from dealers who uphold the system; and they should not be enjoined.

We are confirmed in this conclusion by observing, when we analyze the paragraph carefully, and compare, upon one side the clear general right of the respondent to refuse to deal further with price cutters, and upon the other side the prohibitions of this paragraph: As to subsection 1, although respondent *may*, for the guidance of its own conduct, lawfully formulate its schedules of desired resale prices with due regard to varying freights, it *may not* lawfully consult its dealers as to what would be fair treatment to them in this respect. As to subsection 2, respondent lawfully *may* act upon any report of price cutting, spontaneously sent in, in his own interest, by a dealer; hence, of course, it *may* lawfully have the intention so to act, but it *may not* manifest this intention. As to subsection 3, respondent lawfully *may* cut off a reported price cutter who is, in its view, contumacious; it rightly *may intend* to do so, but it *may not* inform dealers that it so intends. As to subsection 4, respondent *lawfully may* discontinue trade with one charged to be a price cutter, and *fairly may* do so if the charge is true, but it *may not* have its salesman investigate the truth of the charge and advise dealers thereof. These distinctions do not appeal to us as having any basis in sound reasoning.

[4] It is urged that there should have been an express finding by the Commission that the public interest required the action which it took. However important, or even jurisdictional, such a finding may sometimes be, we think it not necessary in this class of case. It was the main purpose of the Federal Trade Commission Act to provide for scrutiny and restraint of those trade practices which tended towards monopoly or involved restraint of trade. The phrase "unfair competition," or "unfair methods of competi-

tion," is a misnomer when applied to this class of acts. To destroy competition, and to compete unfairly, are not equivalent, unless the acts (like selling below cost), though immediately promoting competition instead of restraining it, are aimed at ultimate restraint by destroying a competitor. Unfair competition had substantially come to mean "palming off." However, the phrase "unfair methods of competition," in section 5 of the statute, was used as a catch-all to cover as well everything which tended to restraint of competition as some cases of or analogous to palming off. Winsted Hosiery Case, 42 S. Ct. 384, 258 U. S. 483, 66 L. Ed. 729. It was the latter class as to which it was constantly insisted in Congress the act would not apply, if there were mere private controversies between competing traders (Silver Co. v. F. T. C. [C. C. A.] 289 F. 985, 996), and hence it was provided that the Commission ought not to proceed unless the public interest was involved to a degree and extent not inherent in merely private disputes. As to practices or contracts which were in direct restraint of trade, the public interest was necessarily involved, unless the matter was too trifling. If price-maintenance methods are invalid, it is because they do constitute a direct and absolute restraint upon a kind of competition which is thought to be within the act. In such a case, the conclusion of public interest follows as a matter of law, and a special finding to that effect would have no purpose.

[5] Finally, it is contended that the rule of reason must be applied in these cases, as in other cases under the Sherman Act, and that the restraint here practiced was not great enough, or used in enough cases, and did not maintain prices large enough, to justify saying that it was unreasonable as between the immediate parties or in the public interest. If we are to adopt and follow, as we think we must, the underlying principles of the Park Case, we see no room for this quantitative test. The restraint (so far as petitioner's methods are effective) is positive and direct. All sales are absolutely forbidden, except those made under the restriction. The amount of business done and affected by the system is substantial enough so that the practice, if wrong, cannot be overlooked. Though probably it is true as petitioner says, yet it is not material, that no complaint was ever made of the reasonableness of the scheduled prices, nor was there any complaint of the system, except by two

dealers who had been cut off, and who had no legal grievance.

The order is affirmed, excepting as to paragraph 4, as to which it is vacated. There will be no costs awarded.

NOTE.

Typical Letter from Petitioners to Supposed Price Cutter.

"* * * You buy No. 1 and No. 1–A tools at a discount of 40–20%, and we submit you cannot afford to sell them at 40–5%, or anywhere near that price. The proper quotation covering these tools in your territory ought to be a discount of 35% from list. Will you please investigate the quotation made by you to the two parties named, and let us know if our information is correct? We shall also be glad to have a word of advice from you as to what your future policy in this connection would be."

Typical Letter of Assurance from Dealer to Petitioner.

"* * * However, the harm has been done, and no one regrets it more than I, and assuring you again that, if the Baird Company cannot get business without price cutting, then we will give up business.

"In conclusion, all I can say is, 'Kindly reconsider the matter.' Assuring you that the writer personally, as well as our entire organization, heartily uphold your policy, and will work with you in every possible manner in order to prove to you that we are worthy of your confidence."

Typical Letter from Petitioners to All Dealers in a Community.

"* * * Now, where there is so much smoke, there must be some fire, and we are quite convinced that some of the jobbers in your community are cutting prices in this fashion.

"Our purpose in writing this bulletin is to point out how supremely foolish this practice is.

"'TOLEDO' prices are stabilized. For over a year now, our price schedule has been lower that competitive tools have been sold at, or are being priced at now. Our larger tools are strictly on a pre-war basis.

"Our price schedule provides a reasonable margin of profit.

"It does not permit of any lowering of this margin, however, by rebates, or price cutting in any other fashion, if you are to have any profit whatever on the sale of our goods.

"Because the general market has gone crazy, and you are selling certain commodities for about half of what they cost you, does not justify you from the standpoint of good sense, in selling 'TOLEDO' tools at any other price than our regular published resale schedule.

"And to those of you jobbers who do business west of the Mississippi river the above statement applies in the securing of our western resale schedule, which is, in all cases, 5 points higher than the Chicago schedule.

"You jobbers are a funny lot. Every so often we are beseiged to provide a wider margin of profit, because you say you can't make any money at our regular schedule, and yet you

will not keep for yourself the margin of profit we do provide.

"Now we propose, if it is at all possible, to see that our resale schedules are maintained. The 'TOLEDO' factory is running full time and is busy, and, if we have to, we can well get along without Chicago business. We are going to sell our tools to the jobbers who do maintain our prices, who will get a reasonable margin of profit on which to do business.

"May we not have your co-operation? We want a real show-down in this matter with all the cards on the table.

"Trusting that we may have a full and complete reply by return mail, we are."