RICHARD T. GREEN CO. et al. v. CITY
OF CHELSEA.

No. 4055.

Circuit Court of Appeals, First Circuit.

June 1, 1945.

928

See also 51 F.Supp. 117.

George K. Gardner, of Boston, Mass. (Samuel Hoar and Goodwin, Procter & Hoar, all of Boston, Mass., of counsel), for appellants.

Joseph Israelite, of Chelsea, Mass. (James F. Sullivan, of Boston, Mass., John F. Donovan, of Chelsea, Mass., and Julius Stevens, of Boston, Mass., of counsel), for appellee.

Samuel S. Dennis, Asst. Corp. Counsel, of Boston, Mass., for City of Boston, amicus curiae.

Before MAHONEY and WOODBURY, Circuit Judges, and FORD, District Judge.

MAHONEY, Circuit Judge.

This case involves conflicting claims to $140,000, part of the compensation deposited in the Registry of the District Court by the United States in connection with the taking of certain parcels of land on the waterfront of Boston Harbor, commonly known as the Richard T. Green Shipyard, Plant No. 2. Richard T. Green Company, M. Thomas Green, trustee, and the First National Bank of Boston (hereinafter called the "Owners") have appealed from a decree of the court below awarding the sum in question to the City of Chelsea. The question presented turns on the validity of a lien for taxes for the years 1932 to 1942, inclusive.

For tax assessment purposes it appears that the shipyard has been treated as three separate parcels by the assessors of the city. On Parcel 1, assessed as 93,538 square feet of land, there was a "marine railway," and in each of the years in question the assessors assessed as real estate all its component parts, including the hoisting machinery to haul the "cradle" up and down, the cradle itself, and the understructure on which the cradle moved. Parcel 2 was assessed as 51,236 square feet. Up to extreme low-water mark, or the Boschke Line, it contained only 31,000 square feet. Between the extreme low-water mark and the United States Pierhead and Massachusetts Harbor Line of 1890, however, there were an additional 32,100 square feet of flats. Parcel 3 was assessed as 22,650 square feet and actually contained 21,773 square feet.

On September 5, 1934, all three parcels were sold to satisfy unpaid 1932 taxes, and tax deeds to the City of Chelsea were made out and duly recorded. On May 5, 1938, the 1932 taxes were paid in full, and payments were made on the 1933 taxes—in full with respect to Parcels 2 and 3, in part with respect to Parcel 1. These were the only taxes ever paid for the years 1932 to 1942 inclusive.

By a recorded deed dated November 24, 1941, Richard T. Green Company conveyed the shipyard to M. Thomas Green, trustee, for a valuable consideration, and on January 22, 1942, the date of the taking by the United States, the First National Bank of Boston had a mortgage on all three parcels.

The District Court held that the City had acquired a valid tax title in 1934 and that there was a valid lien for all the accumulated taxes and interest. Before this court the owners contend (1) that the City had no tax title nor lien on any of the three parcels to secure taxes assessed after 1932 for the reason that the Tax Collector had failed to certify to the City Treasurer these taxes for addition to the tax title as required by Massachusetts law; (2) with respect to Parcel 1 that the City got no tax title nor any lien because all the assessments thereon included assessments on personal property, that is, the ship cradle, the hoisting machinery, and that part of the marine railway which extended below the low-water mark; and (3) with respect to Parcel 2 that the City acquired no tax title nor any lien for the reason that all the assessments thereon included assessments on land below low-water mark belonging to the Commonwealth of Massachusetts. We shall dispose of these contentions in the order in which they appear here.

■ The District Court held that the question of proper certification of subsequent taxes was immaterial to the question whether or not there was a valid lien. It therefore refused to hear any evidence on the question of certification. United States v. Five Acres of Land, D.C., 51 F.Supp. 117. This issue turns on the proper construction of Chapter 60, Section 61 of the Massachusetts General Laws (Ter.Ed) as amended,[1] which the lower court construed as meaning merely that subsequent taxes must be certified in order to make their payment part of the terms of redemption. It was of the opinion that the legislature "did not intend that failure properly to certify subsequent taxes should invalidate the lien for those taxes, but merely that, when taxes were not properly certified, payment of them should not be made a part of the terms of redemption." We agree.

■ G.L.(Ter.Ed.) c. 60, § 37, as amended by St.1936, c. 146, provides that a tax lien shall exist from the assessment date and that it shall terminate after a specified period "except as provided in section sixty-one." § 61 provides that where a town acquires a tax title to real estate the lien for all subsequently assessed taxes "shall continue." The latter half of the section provides, "if any of the said subsequent taxes have not been certified * * * then redemption may be made by payment only of the amount of the tax for which the estate was purchased or taken and of such subsequent taxes as shall have been so certified." The failure to certify affects the requirements of redemption, but it does not vitiate the prior substantive provision that the lien "shall continue." The Supreme Judicial Court of Massachusetts subscribes to the rule that "where, in a statute, an express limitation or proviso is made with reference to a given subject matter, and, in the same statute, no such limitation or proviso is made applicable to a related subject matter, the absence of the limitation or proviso in the second instance is a strong indication that it is not intended to apply, or, by implication, that it is excluded." In re Opinion of the Justices, 309 Mass. 571, 605, 34 N.E.2d 527, 547. This interpretation of the statute under consideration comports with the decision in City of Boston v. Barry, 315 Mass. 572, 577, 578, 53 N.E. 2d 686, 688. In that case dealing with the requirement of certification in relation to the terms of redemption, the court said that: "The purpose of requiring certification on or before a particular day is, we think, to fix a time when the responsibility of the collector ends and that of the treasurer begins. With that matter a taxpayer has little or no concern. His interests are sufficiently protected by the provision that on redemption he need not pay subsequent taxes that have never been certified. * * * the statutory requirement is merely a regulation of departmental relations within the municipal government." And see City of Chelsea v. Richard T. Green Co., Mass., 60 N.E.2d 351, an action in the Land Court by the City as holder of the title to foreclose rights of redemption. The only question there related to the payment of taxes for the years 1933 to 1940 inclusive as one of the terms of redemption. Certification had taken place after the petitions were filed but before they had been heard by the Land Court. Citing Boston v. Barry, supra, the court held that such certification was not too late and that the taxes involved were therefore part of the terms of redemption.

[1] G.L.(Ter.Ed.) c. 60, § 61, as amended by St.1936, c. 93.

"Whenever a town shall have purchased or taken real estate for payment of taxes *the lien* of the town on such real estate for all taxes assessed subsequently to the assessment for payment of which the estate was purchased or taken *shall continue*, and it shall be unnecessary for the town to take or sell said real estate for nonpayment of said subsequent taxes, costs and interest; and on redemption from such taking or purchase, said subsequent taxes, costs and interest shall be paid to the town, and the payment shall be made a part of the terms of redemption, except that if any of the said subsequent taxes have not been certified by the collector to the treasurer to be added to the tax title account, then redemption may be made by payment only of the amount of the tax for which the estate was purchased or taken and of such subsequent taxes as shall have been so certified, together with costs and interest. The collector shall certify to the treasurer not later than September first of the year following that of their assessment all subsequent taxes which become part of the terms of redemption and the treasurer shall give him a certificate stating that the amount or amounts have been added to the tax title account or accounts and the collector shall be credited as if the tax had been paid in money. * * *"

The Owners' second contention turns on whether the entire marine railway was properly assessed as real estate. As described by the court below:

"The marine railway consists of a foundation, a track structure, a cradle, and hoisting machinery. The foundation upon which the track rests is constructed of wood and rests on piling which was driven and cut for the required slope. The cradle itself is three hundred and forty feet long, and, including the stone ballast, weighs approximately one thousand tons. It could safely carry 3,600 tons. The hoisting machinery, contained in a building, and consisting of a winch and steam engine, is set on bolts and secured by nuts. The bolts range in length from 5 to 8 feet, and are buried in concrete. The marine railway contains all the essentials of a drydock. It was constructed pursuant to a license dated May 28, 1919, issued by the Division of Waterways of the Department of Public Works of the Commonwealth of Massachusetts, and extends to the Massachusetts Harbor Line, a considerable distance beyond the so-called Boschke Line of 1861, which is the extreme low water mark. The cradle travels up and down the inclined railway. The upper end of the railway is above water, and the lower end is in considerable depth of water, so that when the cradle is all the way down a ship can be floated onto it, and then the cradle can be pulled up the incline, bringing the ship with it. When the cradle is all the way down, it is, in part, outside the Boschke Line. * * * The cradle is not attached to the understructure in any way, but just rests on it. The cradle operates on a series of free rollers on a flat metal track, and the power for pulling it ·is a system of four endless chains attached to the cradle and passing over sprockets on a big geared winch and around sheaves. The weight of the foundation and hoisting machinery is approximately 160 to 170 tons. The machinery, consisting of a winch and the steam engine which operates it is set on long bolts imbedded in a heavy concrete foundation inside the boiler house located on high land on the upper end of the marine railway and kept in place by large nuts screwed on to these bolts. The machinery could be removed by unfastening the nuts and lifting the machinery off the concrete foundation. The cradle could be removed from the particular location to another location either by removing its ballast or by the use of lighters to make it float. However, if it were removed to a new location, a new railway and foundation would have to be built in order to accommodate this particular cradle. The cradle was constructed on the premises. The marine railway could not function without the cradle or without the tracks or without the chains and rollers or without the machinery. It requires the unity of the entire structure and all its component parts for operation as a marine railway."

By Massachusetts law real estate and personal estate are distinct classes of property for the purposes of taxation. G. L.(Ter.Ed.) c. 60, § 37, as amended, makes taxes upon real estate a lien upon the property. There is no statute making taxes on personal property liens thereon, and they cannot be collected by the sale of such property. Hamilton Manufacturing Company v. Lowell, 185 Mass. 114, 69 N.E. 1080; Dunham v. Lowell, 200 Mass. 468, 86 N.E. 951. Real estate includes, "all land * * * and all buildings and other things erected thereon or affixed thereto";[2] "personal estate for the purpose of taxation (includes) * * * Goods, chattels * * *";[3] "the following property and polls shall be exempt from taxation * * * Sixteenth, Property, other than real estate, poles, underground conduits, wires and pipes, and other than machinery * * *".[4]

Impressed by the degree of physical attachment and affixation, the weight of the cradle and machinery, the complete interdependence of the cradle, the machinery, the foundation and the track—it was noted that even·the cradle was attached by chains' —the district court regarded this aggregation of component parts as an entity and called it real estate.[5] It relied on the fact that the cradle was built on the premises and the fact that—

"If the cradle were moved, a new foundation and track would have to be built to conform with the dimensions of the cradle. If the machinery were moved, it could be used again only in connection with a marine railway. The cradle, the machinery,

---

[2] General Laws (Ter.Ed.) c. 59, § 3.
[3] General Laws (Ter.Ed.) c. 59, § 4.
[4] General Laws (Ter.Ed.) c. 59, § 5.
[5] The district court properly excluded the testimony of the Chairman of the Assessors of Quincy on the question whether or not the cradle was real estate and treated it as a question of law.

the foundation and the track being attached to each other * * * and built to operate in conjunction with each other for a single purpose, should be considered an entity."

The Owners rely on Hall v. Carney, 140 Mass. 131, 3 N.E. 14; Metropolitan Ice Company v. Assessors of Cambridge, 1939 Appellate Tax Board Advance Sheets, 105; and Hamilton Manufacturing Company v. Lowell, supra, and contend that the cradle and machinery cannot be treated as real estate and that the court below erred in applying its entity theory. We do not agree.

Hall v. Carney, supra, involved the validity of an attachment of a railroad car as personal property by the sheriff. The defense was that the car was a fixture. The year of the decision was 1885 and the cars involved were narrow-guage railroad cars which could not be operated on any other track in the vicinity. The court held merely that railroad cars are, for the purposes of attachment, personal property, and that the statutes clearly treat them as such and provide a special mode of attaching them. In Hamilton Manufacturing Company v. Lowell, supra, the question was the proper valuation of property and machinery used for manufacturing. The contention was made there that land, buildings and machinery used for manufacturing constituted a single unit for taxation. The court observed that land and the buildings on it are ordinarily part of the same real estate which cannot be separated for the purpose of collecting taxes and held that "this principle does not apply to machinery in a mill used, with land and buildings, for manufacturing purposes" in face of the statutory provisions that "machinery" be valued separately and taxed as personal property. [185 Mass. 114, 69 N.E. 1081] That is not the instant case, however. Here we have no mill and no machinery used for manufacturing purposes.[6] We think the trial court properly found that the marine railway was an entity within the coverage of G.L.(Ter.Ed.) c. 59, § 3, providing that real estate includes land and "all buildings * * * erected thereon or affixed thereto," Franklin v. Metcalfe, 307 Mass.

386, 30 N.E.2d 262; Milligan v. Drury, 130 Mass. 428. The case of Metropolitan Ice Company v. Board of Assessors of City of Lawrence, supra, is not in conflict. That case involved buildings and machinery used in the manufacture of ice, and the question under review was what machinery should be valued as real estate. The manufacturing building contained pumps, compressors and machines set on concrete bases on one side and the balance of the floor was occupied by a large brine tank. Attached to the manufacturing plant is a storage plant into which ice is conveyed for storage. The board of assessors viewed the property and treated the tracks on which the crane ran, the brine tank and the water cooling structure as real estate. The movable crane itself by which ice was moved, the pumps and the compressors were classified as machinery. As was observed in Hemenway v. Milton, 217 Mass. 230, 233, 104 N.E. 362, 363, L.R.A.1915C, 949: "Tax laws are enacted for practical ends. They must be administered in large part by the plain citizens who are elected assessors * * *. They should be construed and interpreted as far as possible so as to be susceptible of easy comprehension and not likely to become pitfalls for the unwary."

It is well settled in Massachusetts law that private property in land extends only to the low-water mark. Commonwealth v. Alger, 7 Cush., Mass., 53; Wonson v. Wonson, 14 Allen, Mass., 71. The District Court found that part of the marine railway was extended beyond the low-water mark under a license from the Commonwealth and ruled that such license "did not grant any title to real estate." It does not follow, however, that this part of the structure could not be assessed to the owners as real estate for purposes of taxation. Flax Pond Water Co. v. Lynn, 147 Mass. 31, 16 N.E. 742, involved a dam built upon land of another, and the court there held that the tax upon the dam was properly assessed to the owner thereof as a tax on real estate. With respect to the defense that the owners never acquired title to any real estate connected with the waters of the pond where the dam was, the court called such facts immaterial to the question

---

[6] Counsel for the City of Chelsea cites in its brief at p. 37 the trial court's Memoranda of Findings of Fact and Rulings (original papers in Social Law Library, Boston, Mass.) in Hamilton Manufacturing Company v. Lowell, supra, wherein it appears that "the circulating pipes for heating, the sprinkler pipes and the elevators were so affixed to the realty as to be properly included in the valuation of the buildings."

of taxation. It noted that it was the policy of the legislature that all valuable property be taxable in some form and held, "Real estate, for the purpose of taxation, includes all lands and all buildings and other things erected on or affixed to the same * * * This language is clearly broad enough to include the dam and sluiceway, which are certainly 'things erected or affixed to the land'". That is the situation in the instant case. Cf. Boston Manufacturing Co. v. Newton, 22 Pick., Mass., 22.

■■■■ With respect to Parcel 2, the Owners contend that the lien is invalid because this land at all times material was assessed with land between the low-water mark and the United States Pierhead and Massachusetts Harbor Line of 1890, which belonged to the Commonwealth.

The District Court ruled correctly that the boundary of private ownership of land is normally the low-water mark. Commonwealth v. Alger, supra; Wonson v. Wonson, supra. In 1846, however, the Winnisimmet Company, a predecessor in title to the Owners, was granted authority by the legislature—"for the better accommodation of the public travel * * * to extend their wharves and docks for the reception of ferry boats * * * with the right and privilege of using and occupying the flats within, or adjoining said wharves and structures for the purpose of said ferry * * *." The Owners contend that this is merely an easement which ceased when the ferry was given up. That does not appear to be applicable Massachusetts law. Bradford v. McQuesten, 182 Mass. 80, 64 N.E. 688, 689, involved a grant by statute made by the Legislature in 1851 of authority to extend a wharf into the harbor channel as far as the harbor line. The court held that the statute operated as a legislative grant subject to the terms and conditions expressed in it. It noted that: "No particular words are necessary to constitute a legislative grant, and the commonwealth could divest itself of any right or title in or to the ·flats * * * as well by an act of the legislature as by a more formal instrument * * *. Hundreds of similar acts had been passed before St. 1869, c. 432, was enacted declaring that any authority thereafter given to build on or enclose ground in tide waters should be construed as a revocable license, and it has been the common understanding, we think, that they operated as grants, and wharves have been built and improvements made on that footing." And in Treasurer & Receiver General v. Revere Sugar Refinery, 247 Mass. 483, 490, 142 N.E. 909, 910, the court held "where the Commonwealth is the grantor, it can take advantage of a breach of a condition subsequent only by judicial proceedings or by a legislative declaration of forfeiture." While the grant is to be construed "strongly"·against the grantee "it does not expire of its own limitation." Cf. Attorney General v. Boston Wharf Co., 12 Gray, Mass., 553, 564. It follows, therefore, that the Owners, as successors in title to the Winnisimmet Company, acquired a fee interest in that area beyond the low-water mark.

For at least ten years prior to the taking of the three parcels in question, the assessors of the City of Chelsea have assessed as real estate the full area in question. It is our opinion that they acted properly in so doing.

The judgment of the District Court is affirmed with costs to the appellee.