**ADAMS–MITCHELL CO. v. CAMBRIDGE DISTRIBUTING CO., Limited.**

No. 96, Docket 21810.

United States Court of Appeals,
Second Circuit.

Argued Dec. 11, 1950.

Decided May 31, 1951.

Frank, Circuit Judge, dissented.

914

Dills, Muecke & Schelker, New York City, for plaintiff-appellee; Walter G. Schelker, Jr., New York City, counsel.

Clarence P. Greer, New York City, for defendant-appellant; I. Maurice Wormser, New York City, counsel.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff, Adams Mitchell Co., a wholesaler of liquor in the Boston area, brought an action in the United States District Court to rescind an oral contract for the purchase by it of 1100 cases of "Auld Malcolm" Scotch type whiskey at $16.92 a case from the defendant Cambridge Distributing Co., Ltd., which had the exclusive distribution of "Auld Malcolm" in Massachusetts. One thousand and sixty cases remained unsold at the time of the action. The plaintiff based its claim on the defendant's failure to maintain the price and to limit the number of distributors of "Auld Malcolm" in the Boston area as orally agreed at the time of the sale. The damages were stipulated to be $19,296.60 and the jury found for the plaintiff in that sum, which was the cost to the latter of the 1060 cases unsold. The trial court denied a motion by the defendant to dismiss the plaintiff's claim for rescission because of an oral agreement to fix prices in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note; because Sager, its salesman, was without authority

to bind the corporation to such a contract; and finally because the offer to return 1060 of the 1100 cases of whiskey was insufficient.

There was evidence from which the following was found: On or about June 15, 1946, at a time when the plaintiff was having difficulty in obtaining a supply of Scotch whiskey, it was approached by Sager, the defendant's salesman for Massachusetts, Connecticut and Rhode Island, who offered it "Auld Malcolm" in carload lots at $16.92 a case. The plaintiff was concerned about the amount of "Auld Malcolm" available in the area which could be offered in competition with it if it were to purchase such a substantial supply. Sager assured the plaintiff that there were then only two outlets for the sale of "Auld Malcolm" in the area, that one of them—Branded Liquors—was to be discontinued, and had only a small supply on hand, and that defendant would see that this supply was turned over to another regular distributor of "Auld Malcolm" so that the plaintiff and one other would be the only distributors of "Auld Malcolm" in the area. Plaintiff also claimed that Sager agreed that the defendant would see to it that the going wholesale price of "Auld Malcolm" of $54.80 a case would be maintained, but the jury disagreed as to the existence of this agreement. The plaintiff then ordered from Sager 1100 cases of "Auld Malcolm" which were delivered and paid for early in August. A written order by the plaintiff addressed to the defendant, dated July 3, 1946, followed which contained no reference to the oral agreements with Sager regarding price and the number of distributors. After this date, the defendant sold no more "Auld Malcolm" to Branded Liquors but failed to remove to another distributor the stock that Branded Liquors had on hand, or to divert substantial supplies en route to it, so that there were three wholesalers offering "Auld Malcolm" to the retail trade in the Boston area. The price of "Auld Malcolm" soon started to drop and, with the return to the market of genuine Scotch whiskey in October 1946, "Auld Malcolm" became almost unsaleable.

Shortly after receipt of the "Auld Malcolm" the plaintiff began to complain to Sager orally, and by letter, that Branded Liquors was continuing to sell "Auld Malcolm" and that both Branded Liquors and Gilman, the other authorized distributor, were asking a price of less than $54.80 a case. Sager assured the plaintiff that this was a temporary condition and would be quickly corrected. Negotiations dragged on without result, and in October 1946 the plaintiff finally demanded that Sager take back the merchandise as Sager agreed to do. After further delay occasioned by Sager's assurances and excuses, the plaintiff, on December 2, 1946, made a direct demand on the defendant to take back the "Auld Malcolm" then unsold. The present action was brought in March, 1947, after the defendant's refusal to comply with this demand.

In addition to its general verdict for the plaintiff the jury rendered a special verdict that the contract between the parties was not to be found solely in the writings exchanged by them, that Sager orally agreed that there would be only one wholesaler besides the plaintiff offering "Auld Malcolm" in the Boston area, that Sager had express or implied authority to make such a contract, that plaintiff relied on such authority, and that the contract was broken.

The defendant's first contention is that as the contract was illegal neither party acquired any rights under it and hence plaintiff did not have the right of rescission. The contract is said to violate both the Federal Alcohol Administration Act, 27 U.S.C.A. § 205(d) and the Sherman Act, 15 U.S.C.A. § 1, ff.

The pertinent part of the Alcohol Administration Act bars the purchase of liquor on consignment, conditional sale or with the privilege of return. While the plaintiff's original declaration contained counts alleging the breach of a contract to repurchase the whiskey, we need not reach the question whether such an agreement would violate the Alcohol Administration Act because the plaintiff withdrew the counts based on a contract to repurchase before the case went to the jury and

916

relied solely on the right to rescind. Furthermore, the defendant vigorously denied the existence of any agreement to repurchase. Under such circumstances there is no violation of the Alcohol Administration Act for our consideration.

■ It may be conceded that agreements made between sellers, or between a seller and his customers, to *fix* the resale price of goods moving in interstate commerce, so far as not exempted by the Miller-Tydings Amendment, 50 Stat. 693, violate the Sherman Act, e. g., Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259. But the evidence here does not indicate such an illegal agreement. There are legitimate means of price maintenance in spite of the provisions of the Sherman Act, e. g., United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. Such means include a refusal to sell in the future to those who had not maintained a suggested price. The situation in Kiefer-Stewart Co. v. Seagram & Sons, supra, was different for there competitors agreed on a price to be fixed with the customers of both and fixed the price with the latter. There was no evidence that the defendant agreed with Branded or Gilman that the prices to be charged by them would be limited to $54.80 per case. If there was an agreement to that effect between the plaintiff and the defendant which Sager denied, such an agreement did not purport to control the prices of Branded and Gilman and indeed went no farther than to suggest that if the latter cut prices they would be unable to obtain further supplies of "Auld Malcolm" from the defendant; in other words, the limitation of $54.80 per case was and only could be a suggested limitation to a purchaser which was lawful under the decision of the Supreme Court in the Colgate case.

■ The Miller-Tydings Amendment exempts from the Sherman Act price maintenance agreements of the type involved here where permitted by State law and Massachusetts—where the contract under consideration was made—has such a law. Mass.Stat.Ann. Ch. 93, § 14A. It is said in Judge Frank's dissenting opinion that the Miller-Tydings Amendment does not apply because it only amended the Sherman Act of 1890 and did not affect the anti-trust provisions of the Wilson Tariff Act of 1894, 28 Stat. 570, 15 U.S. C.A. § 8 et seq. We do not think that the Miller-Tydings Amendment should be so limited. It was an amendment to the original Sherman Act enacted some 43 years after the passage of the Wilson Tariff Act when the Sherman Act and the Tariff Act each embraced like prohibitions on restraint of foreign commerce. When the Sherman Act was amended in 1937 to exempt cases where a local State statute permitted resale price maintenance it must be deemed to have superseded the Wilson Tariff Act so far as to sanction price maintenance in cases within the purview of the State Act.

■ The parties to a contract are presumed to contract in compliance with existing laws. Rackemann v. Riverbank Improvement Co., 167 Mass. 1, 44 N.E. 990; Meyer v. Price, 250 N.Y. 370, 165 N.E. 814; Michigan Millers Mutual Fire Insurance Co. v. Canadian Northern Ry. Co., 8 Cir., 152 F.2d 292. Furthermore, unless the illegality clearly appeared the defendant had the burden of pleading and proving this defense. 5 Williston, Contracts (Rev. Ed.) § 1630A. It failed to do either and denied the existence of the allegedly illegal price agreement. In addition to the foregoing, even if the arrangement as to prices to be charged by Branded and Gilman were assumed to have been illegal it would not bar rescission because the illegal part was executory. National Bank & Loan Co. v. Petrie, 189 U.S. 423, 23 S.Ct. 512, 47 L.Ed. 879; Restatement, Contracts § 605.

■ The defendant's next contention is that Sager as a salesman had no authority to make this agreement so that the question of his authority to limit the number of purchasers and to suggest resale prices should not have gone to the jury. But Sager testified without contradiction that Roer, the defendant's president, had decided on the two wholesaler policy and the $54.80 price prior to the sale in question and had

authorized Sager to disclose this to buyers. Under the circumstances it was not error to let the jury decide whether Sager had actual or apparent authority to bind the defendant to maintain the policies that he was authorized to set up as an aid to obtaining sales.

Furthermore the question of Sager's authority is beside the point. An action for rescission will lie even if based on an entirely unauthorized representation, where the agent is entrusted with the negotiations leading up to the sale. A principal is not permitted to hold a buyer to one part of a contract which was authorized, and to refuse to perform another part which was unauthorized. The principal must affirm or reject in toto the contract as made by the agent. National Bank & Loan Co. v. Petrie, 189 U.S. 423, 23 S.Ct. 512, 47 L.Ed. 879; Rackemann v. Riverbank Improvement Co., 167 Mass. 1, 44 N.E. 990; Dennette v. Boston Securities Co., 206 Mass. 401, 92 N.E. 498.

The defendant's final contention is that the plaintiff's delay until December 2, 1946, in tendering the whiskey to the defendant, and its failure to tender back the full 1100 cases purchased barred rescission. Each case must stand on its own facts, American Steam Gauge & Valve Mfg. Co. v. Mechanics Iron Foundry Co., 214 Mass. 299, 101 N.E. 376, and, in our opinion, the facts in the case at bar would permit rescission. Here, Sager had continually promised that the defaults under the contract would be cured. When the defaults continued, the plaintiff threatened to rescind on November 1, and delayed until December 2 on account of Sager's illness. Under the circumstances we hold that the tender was timely. Delay in the tender is excused if caused by the assurances of the seller that defaults will be made good. Boles v. Merrill, 173 Mass. 491, 53 N.E. 894; Joannes Bros. Co. v. Czarnikow-Rionda Co., 121 Misc. 474, 201 N.Y.S. 409, affirmed 209 App.Div. 868, 205 N.Y.S. 930.

The defendant makes much of the fact that the plaintiff purchased 1100 cases, that the tender was for 1,067 cases, and that the plaintiff had only 1,060 cases on hand at the trial. It argues that for effective rescission the entire subject matter must be returned. This is not so where, as here, the sales were made on assurance that the breach would be cured, were small in amount, and the money value of the goods sold at $16.92 a case, can be easily determined. Restatement, Contracts, § 349(2) (e); 5 Williston, Contracts (Rev. Ed.), § 1463. In addition to this the plaintiff was better off without a full tender, cf. Czarnikow-Rionda Co. v. West Market Grocery Co., 2 Cir., 21 F.2d 309, for the "Auld Malcolm" had become practically unsaleable and worthless. Nor is inconsistency between the number of cases tendered and the number possessed by the plaintiff at the trial a bar to rescission. This might have been the result of an inventory error but even if, as defendant contends, the discrepancy was because the plaintiff sold seven cases of "Auld Malcolm" after December 2, 1946, such " 'Slight and trivial' acts of affirmance will not destroy a rescission once unequivocally made." Albert v. Martin Corp., 2 Cir., 116 F.2d 962, 965.

For the foregoing reasons the judgment of the court below must be affirmed.

FRANK, Circuit Judge, dissenting.

1. I think the anti-anti-trust lawyers and their clients will welcome the foregoing decision for two reasons: First, it breathes new life into the remains of the decrepit doctrine of United States v. Colgate & Co., 250 U.S. 300,[1] 39 S.Ct. 465, 63 L.Ed. 992, thereby condoning a form of price-fixing which will simplify evasion of the anti-trust laws. Second, it sanctions retail price-fixing of imported products, by reading the provisions of the Miller-Tydings Act of 1937—designated by Congress as an amendment to the Sherman Act of 1890—into those sections of the Wilson Tariff Act of 1894 which outlaw contracts intended to restrain free com-

---

1. See Refusals to Sell and Public Control of Competition, 58 Yale L.J. 1121 (1949).

petition in, or to raise the market price of, articles imported into the United States.[2]

2. As my colleagues rely, in part, on defendant's failure to plead and prove illegality, I shall first briefly state what the record discloses: The plaintiff (in that part of its complaint never withdrawn) specifically alleged that it made the purchase of "Auld Malcolm" Whiskey—to be shipped from Canada to Boston—in reliance on, and in consideration of, two essential promises of the defendant, which had the "exclusive agency" to sell that whiskey to wholesalers in Massachusetts: (1) Defendant promised that it "would see to it that said wholesale selling price [of $54.80 per case] would be maintained throughout Massachusetts."[3] (2) Defendant promised that plaintiff and one other wholesaler "would be the only two wholesale liquor dealers offering and selling Auld Malcolm Brand in the Boston area." Plaintiff alleged in its complaint, and its witnesses emphatically testified, that it had rescinded on account of defendant's breach of both those promises.

Two witnesses for plaintiff testified that the agreement was as alleged. One of defendant's witnesses testified that, at most, defendant's agent had spoken of defendant's usual practice of refusing to make further sales to any wholesaler who did not maintain the price of $54.80. At the close of the evidence, defendant moved to dismiss on the ground that the agreement was illegal. The trial judge denied this motion. The jury, which returned a general verdict for plaintiff, gave no answer to a special interrogatory as to whether the defendant agreed "to see to it that the

price would be maintained." However, the trial judge, in denying a motion for new trial, wrote an opinion in which he made no direct finding on that issue of fact but in which he said, in effect, that he construed the agreement as one by which the defendant promised it would refuse to sell to any wholesaler who did not maintain the $54.80 price. My colleagues treat that as a correct interpretation of the contract, and (although with some doubt[4]) I shall do the same.

3. My colleagues, as I understand them, deal with the issue of illegality on these four grounds: (a) The Miller-Tydings Act removes the resale price maintenance here from the ban of the anti-trust laws; (b) even if the anti-trust laws do apply here, the form of price-fixing contemplated by this contract does not violate them; (c) even if this contract was illegal, (1) defendant had the burden of pleading and proving illegality, and (2) the illegality did not prevent rescission by the plaintiff because the illegal part of the agreement was "executory." I shall attempt to answer each of these arguments in turn.

4. *The anti-trust provisions of the Wilson Tariff Act invalidate the contract here, since those provisions are not affected by the Miller-Tydings Amendment to the Sherman Act.*

This transaction was a sale of whiskey to be imported by the plaintiff from Canada. Since the contract contained provisions designed to fix the price of imported goods, it came within the plain language of the anti-trust provisions of the Wilson Tariff Act which condemn such contracts in the import trade.[5] However, my colleagues

2. 15 U.S.C.A. §§ 8–11, Sections 73–77 of the Wilson Tariff Act of 1894, 28 Stat. 570. Cf. Historical Note to 15 U.S.C.A. § 15.

3. Plaintiff did not withdraw its third cause of action, for rescission, in which it realleged that "defendant agreed that the wholesale selling price of said merchandise was, and would continue to be $54.80 per case, and that defendant would see to it that said wholesale selling price would continue and would be maintained by all wholesale distributors throughout Massachusetts. The consideration for said agreement made by defendant was the giving of said order by plaintiff and plaintiff placed said order in reliance upon said representation and agreement."

4. Plaintiff's evidence seems to me strongly to indicate that defendant agreed to engage in straight old-fashioned price-fixing.

5. 28 Stat. 570, Section 73 of that Act reads as follows: "That every combination, conspiracy, trust, agreement,

say that this contract was valid because the Miller-Tydings Act of 1937—which amended the Sherman Act of 1890 by legalizing price-fixing of trade-marked articles in interstate commerce when valid under a "fair trade" statute of the State in which the goods are to be resold—must be deemed to have amended also, silently, the anti-trust provisions of the Wilson Tariff Act of 1894.

My colleagues' reasoning runs thus: The Sherman Act of 1890 covered restraints on both domestic and foreign commerce; therefore the anti-trust sections of the Wilson Tariff Act of 1894 duplicated and added nothing to the Sherman Act; consequently, when Congress amended the Sherman Act, it must be deemed to have intended, without saying so, similarly to amend the Wilson Act as well. I cannot agree.

If Congress had repealed the entire Sherman Act in 1937, without a word about the anti-trust provisions of the Wilson Act, I hardly think that it would go without saying that Congress intended to obliterate those provisions of the Wilson Act as well. Yet my colleagues work just such an implied repeal by reading the Miller-Tydings Amendment to the Sherman Act into the sweeping anti-trust provisions of the Wilson Act.

Perhaps something could be said for my colleagues' position if, between the enactment of the Wilson Act in 1894 and the adoption of the Miller-Tydings Amendment to the Sherman Act in 1937, Congress had once treated the anti-trust sections of the Wilson Act as so much a part of the Sherman Act as to need no special mention when the intention was to deal with both. But the uniform Congressional practice has been quite the contrary: Four times— in 1903,[6] in 1912,[7] and twice in 1914[8]— Congress enacted legislation which particularly referred to each of the two statutes, i. e., (a) "An Act to protect trade and commerce against unlawful restraints and monopolies, approved July second, eighteen hundred and ninety," and (b) "Sections seventy-three to seventy-seven of an Act to reduce taxation, to provide revenue for the Government, and for other purposes, approved August twenty-seventh, eighteen hundred and ninety-four." Thus when Congress wanted to refer to both

or contract is hereby declared to be contrary to public policy, illegal, and void, when the same is made by or between two or more persons or corporations either of whom, *as agent or principal*, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter. Every person who is or shall hereafter be engaged in the importation of goods or any commodity from any foreign country in violation of this section, of this Act, or who shall combine or conspire with another to violate the same, is guilty of a misdemeanor, and, on conviction thereof in any court of the United States, such person shall be fined in a sum not less than one hundred dollars and not exceeding five thousand dollars, and shall be further punished by imprisonment, in the discretion of the court, for a term not less than three months nor exceeding twelve months." The italicized words were added by an amendment in 1913, 37 Stat. 667.

6. Appropriating money for enforcement of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., the Sherman Act and the anti-trust sections of the Wilson Act with the proviso that, except for perjury, no person should be penalized for any matter concerning which he gave testimony or produced evidence in a prosecution under these acts. 32 Stat. 903–904, February 25, 1903, 15 U.S.C.A. § 32.

7. Barring from the Panama Canal ships owned or operated by persons doing business in violation of the anti-trust provisions of either the Sherman Act or the Wilson Act. 37 Stat. 567, Aug. 24, 1912, 15 U.S.C.A. § 31.

8. Defining the term "antitrust acts" in the Federal Trade Commission Act, 38 Stat. 719, September 26, 1914, 15 U.S. C.A. § 44, and defining the term "antitrust laws" in the Clayton Act, 38 Stat. 730, October 15, 1914. Cf. 15 U.S.C.A. § 12.

the Sherman and the Wilson Acts, it never treated them as one by referring merely to the Sherman Act. More important; in 1913,[9] Congress amended sections 73 and 76 of the Wilson Act without amending or referring to the Sherman Act.

Since Congress has invariably treated the anti-trust provisions of the Wilson Act as separate and distinct from the Sherman Act, I see no reason to suppose that, if Congress had intended by the Miller-Tydings Act to work a partial repeal of those sections of the Wilson Act as well as the Sherman Act, it would have failed, with singular ineptitude, to express its intention on this one occasion. Pertinent here is the familiar "it-would-have-been-so-easy-to-have-said-so" guide to statutory interpretation.[10]

True, Sections 1 and 2 of the Sherman Act include foreign as well as domestic commerce. But there are at least two readily apparent reasons why Congress did what it patently meant to do by enacting the anti-trust sections of the Wilson Act— i. e., to carve out of the Sherman Act the particular subject of combinations and agreements in restraint of the import trade,[11] and to deal with them in a separate anti-trust code.[12]

In the first place, it will be noted that Section 73 of the Wilson Act is far more specific and detailed than are Sections 1 and 2 of the Sherman Act. It not only condemns combinations and agreements by persons "engaged in importing any article from any foreign country into the United States" which are intended to operate "in restraint of lawful trade, or free competition in lawful trade or commerce": it also condemns such agreements which are intended "to increase the market price in any part of the United States of any article * * * imported or intended to

be imported into the United States." This section, then, stressed price-fixing at a time when the Supreme Court had not yet construed the Sherman Act to forbid that practice. This was in keeping with the overall purpose of the Wilson Tariff Act. That Act was pro-consumer legislation, designed to cut the cost of living by lowering the high protective tariffs on imported goods. But if foreign monopolists could fix high prices on their products, manifestly the Act would fail of its purpose, for high prices, whether due to monopoly or to tariffs, would permit domestic producers to charge non-competitive prices, far above cost, for their wares, thereby obtaining higher profits at the expense of the consumer. So Congress, by adopting the anti-trust provisions of the Wilson Act, which were inserted as amendments to that Act on the floor of the Senate,[13] reached as far as it could to prevent monopolistic price-fixing of imported articles: it sought to hit the importer and the American producer who combined with foreign producers. The purpose of these provisions in the words of their sponsor, Senator Morgan of Alabama, was "the repression of trusts * * in respect of the importation of goods from foreign countries." These, he said, were objectionable because their purpose was "to increase the price of certain commodities in the market or to affect them in some way."[14] I think it is clear, in the light of the foregoing, that Congress, by enacting these sections, meant to deal more rigidly, where possible, with restraints of the trade in imported articles.

Further, although §§ 1, 2 and 3 of the Sherman Act dealt with combinations and monopolies in restraint of trade "with foreign nations," it was not altogether clear that the Act dealt with the import

9. 37 Stat. 667, February 12, 1913.

10. For citations, see Obermeier v. U. S., 2 Cir., 186 F.2d 243, 255 note 57.

11. Cf. U. S. v. Sisal Corp., 274 U.S. 268, 274, 276, 47 S.Ct. 592, 71 L.Ed. 1042.

12. Except that they refer specifically to imports, all but the first of the anti-trust provisions of the Wilson Act copied, word for word, the language of §§ 4, 5, 6 and 7 of Sherman Act. See remarks of Senator Morgan, the sponsor, introducing those sections, 26 Cong.Rec. 7117.

13. See the debates, 26 Cong.Rec. 5719, 7117–7120.

14. 26 Cong.Rec. 7117–7118.

trade. For § 6 of the Sherman Act, providing for the forfeiture of property which was the subject of a combination in restraint of trade, referred only to property "in the course of transportation from one State to another, or *to* a foreign country".[15] This could only cover articles domestically produced. Its companion, § 76 of the Wilson Act, closed that gap by providing for the forfeiture of *imported* articles which were the subject of a contract, combination or conspiracy outlawed by § 73. Congress subsequently amended this provision to tighten it, without referring to the Sherman Act.[16]

Thus it is plain that Congress for good reasons singled out the import trade for special anti-trust treatment, and I see no warrant for my colleagues' assumption that it did so solely *pour le sport*. For that assumption defies what has been called a "cardinal rule" of statutory construction— *i. e.*, that, if possible, a statute should be so interpreted as to avoid rendering any part of it "superfluous" or "insignificant." [17] Moreover, the courts have often recognized

the necessity of giving effect to the carving out of a special subject from a general statute or statutory provisions.[18] And neither reason nor authority support the suggestion that an amendment, plainly limited by its language to one statute, should be interpolated by implication into another, unmentioned, statute. Indeed the cases are distinctly contra.[19]

Here, especially, such an implied amendment should not be assumed for several reasons:

(1) There is not the slightest indication, either in the language of the Act or in the Congressional reports upon it,[20] that Congress, in adopting the Miller-Tydings Amendment, even considered foreign commerce. Every reference is to "interstate" commerce.

(2) The Miller-Tydings Act is an amendment to § 1 of the Sherman Act in the form of a proviso that "nothing *herein* contained" [21] shall render intrastate "fair trading" illegal where authorized by state law. As a general rule, a proviso is to be narrowly construed,[22] and, in the absence

15. Emphasis added.

16. 37 Stat. 667, February 12, 1913. See 49 Cong.Rec. 2532 for the debate on this amendment. Cf. text accompanying note 9, supra.

17. Market Co. v. Hoffman, 101 U.S. 112, 115, 25 L.Ed. 782; Ex parte Public Bank, 278 U.S. 101, 104, 49 S.Ct. 43, 73 L.Ed. 202; Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704.

18. See, e. g., Missouri v. Ross, 299 U.S. 72, 76, 57 S.Ct. 60, 81 L.Ed. 46; Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704; Townsend v. Little, 109 U.S. 504, 512, 3 S.Ct. 357, 27 L.Ed. 1012; Robinson v. U. S., 8 Cir., 142 F.2d 431, 432.

19. Markham v. Cabell, 326 U.S. 404, 411, 66 S.Ct. 193, 196, 90 L.Ed. 165: "On the contrary, the normal assumption is that where Congress amends only one section of a law, leaving another untouched, the two were designed to function as parts of an integrated whole. We should give each as full a play as possible." U. S. v. McClure, 305 U.S. 472, 477, 478, 59 S.Ct. 335, 339, 83 L. Ed. 296; "While both sections emanated

from a single prior Section, Congress evidently separated them to provide for the individual treatment that has been given reinstatement as distinguished from revival of lapsed policies. A deliberate separation of the two parts of the old section—applying a restriction to one and not the other—indicates that a change was intended."

See also, e. g., Worcester County Nat. Bank v. Commissioner of Corp., 275 Mass. 216, 175 N.E. 726, 728–729; Richard T. Green Co. v. City of Chelsea, 1 Cir., 149 F.2d 927, 929; Pottawatomie County v. Alexander, 68 Okl. 126, 172 P. 436, 437–438; Dolese v. Pierce, 124 Ill. 140, 16 N.E. 218; State ex rel. Dean v. Daues, 321 Mo. 1126, 14 S.W.2d 990, 1002.

20. The reports are set out in an appendix to the dissenting opinion in Schwegmann Bros. v. Calvert Distillers, 341 U. S. 384, 402, 71 S.Ct. 745.

21. Emphasis added.

22. See, e. g., Schlemmer v. Buffalo, Rochester & P. R. Co., 205 U.S. 1, 10, 27 S.Ct. 407, 51 L.Ed. 681; Spokane & Inland E. R. R. Co., v. U. S., 241 U.S. 344, 350, 36 S.Ct. 668, 60 L.Ed. 1037; Dollar Savings Bank v. U. S., 19 Wall.

of unusual circumstances not present here, is to be deemed to refer solely to that portion of the statute to which it is expressly attached.[23] Furthermore, the Congressional reports refer to the Act as an amendment to the Sherman Act only.[24]

(3) Where Congress did intend, by the Miller-Tydings Act, to amend a statute other than the Sherman Act, it said so expressly in the provision that "fair trading" was not to be an unfair method of competition within the meaning of the Federal Trade Commission Act. Had Congress meant to import the qualifying language of the Miller-Tydings Amendment into the anti-trust sections of the Wilson Act, it easily could and doubtless would have said so.[25]

(4) The Miller-Tydings Amendment worked a repeal, *pro tanto*, of the Sherman Act. To say, as do my colleagues, that by implication it similarly affected the Wilson Act is to ignore the maxim that repeals by implication must never be lightly inferred. More particularly, repeals by implication of the anti-trust laws are not favored. State of Georgia v. Pennsylvania R. Co., 324 U.S. 439, 456–457, 65 S.Ct. 716, 89 L.Ed. 1051; U. S. Alkali Ass'n v. U. S., 325 U.S. 196, 206, 65 S.Ct. 1120, 89 L.Ed. 1554. See also U. S. v. Borden Co., 308 U.S. 188, 198–199, 60 S.Ct. 182, 84 L.Ed. 181, and the Court's state-

ment: "If Congress had desired to grant any further immunity, Congress doubtless would have said so." (308 U.S. at 201, 60 S.Ct. 189).

(5) Finally, the Miller-Tydings Act permits the states to legalize "fair trading" only of "a commodity which bears, * * * the trade mark, brand, or name of the producer or distributor of such commodity." According to the Committee Reports of both Houses,[26] the purpose of the Act was to permit producers to protect the fair name of their trade-marked products from suffering, in the public eye, by being used as "loss leaders." Retailers had resorted to this practice in order to encourage sales in the cut-throat competition which prevailed, especially, during the depression.[27] There is not a syllable to indicate that Congress intended to display a similar solicitude for foreign manufacturers. Indeed, it seems to the last degree unlikely that, if asked to do so, the Congress which enacted the Miller-Tydings Act to help American businessmen to their feet after the depression, would have been disposed to accord similar assistance to their foreign competitors.

In interpreting a statute, sometimes some judicial legislation is unavoidable.[28] So, at times, it becomes necessary for courts to fill in gaps in legislation; in doing so, the courts often use the method (formulated by Aristotle[29] and imported by Plowden

227, 236, 22 L.Ed. 80; Detroit Edison Co. v. S. E. C., 6 Cir., 119 F.2d 730, 739; Shilkret v. Musicraft Records, 2 Cir., 131 F.2d 929, 931.

23. U. S. v. Morrow, 266 U.S. 531, 535, 45 S.Ct. 173, 174, 69 L.Ed. 425: "And although sometimes used to introduce independent legislation, the presumption is that, in accordance with its primary purpose, it [a proviso] refers only to the provision to which it is attached." See also U. S. v. McClure, 305 U.S. 472, 478, 59 S.Ct. 335, 83 L.Ed. 296.

24. See the reports cited in note 20, supra. It is noteworthy that in the Schwegmann case, the dissenting opinion, which gave a broad construction to the Miller-Tydings Act, referred seven times specifically to it as "an amendment to the Sherman Law" or to "§ 1 of the Sherman Law." [71 S.Ct. 752.]

25. See Obermeier v. U. S., cited in note 10, supra.

26. See the reports cited in note 20, supra.

27. See Schwegmann Bros. v. Calvert Distillers, 341 U.S. 384, 398, 71 S.Ct. 745 (dissenting opinion.)

28. See remarks of Supreme Court Justices and others cited in New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 143 F.2d 179, 189, note 31, and in Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 620–621, 155 A.L.R. 761 and notes 38–40.

29. See Aristotle, Nicomachean Ethics, 1137b to the effect that "whenever * * * the statute reads in general terms, but a case arises which is not covered by the general statement, then it is right, where the legislator's rule is inadequate because of its over-simplicity, to correct the omission which the legis-

into our legal system[30]) of imagining what the legislature, if asked, would report that it meant. But, as we said (per Learned Hand, J.), this method of filling in gaps is "utterly unwarranted unless the omission from * * * the text is plain."[31] Surely there is no plain omission in the Miller-Tydings Act. Moreover, if we imagine what the session of Congress which enacted that statute would tell us, if asked whether it was referring to the Wilson Act, I think the answer would be something like this: "In the Miller-Tydings Act we stated in the clearest words that we were amending the Sherman Act. Since previous legislation shows that we always designated the Wilson Act when we intended to amend it, naturally we thought it needless to state in this 1937 statute that we did not mean to modify the Wilson Act."

I think, therefore, we should adhere to the literal language of the Miller-Tydings Act. To be sure, if such an interpretation led to absurd results, and thus imputed to Congress an irrational purpose, it should be spurned.[32] But the result of a literal interpretation here is not at all irrational. One can well understand that Congress, willing to favor price-fixing of .branded, domestic goods, was not willing to do likewise in the case of imported goods. Whether such a differentiation was wise policy is not for courts to consider. As

Mr. Justice Douglas, speaking for the Supreme Court in the just-decided case of Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 388, 395, 71 S.Ct. 747, said of the Miller-Tydings Act: "The omission * * * is fatal * * * unless we are to perform a distinct legislative function by reading into the Act a provision that was meticulously omitted from it. * * * We could conclude that Congress carved out the vast exception from the Sherman [here the Wilson] Act now claimed only if we were willing to assume that it took a devious route and yet failed to make its purpose plain."

5. *The form of price-fixing contemplated by this contract violates the antitrust laws.*

If I am correct in my belief that the Miller-Tydings Act does not legalize price-fixing in the import trade, the next question is whether the form of price-fixing which this contract sought to achieve violates § 73 of the Wilson Act. It may be that price-fixing provisions which would pass muster under the Sherman Act would nevertheless fall foul of the more stringent language of § 73 of the Wilson Act, outlawing contracts intended to "increase the market price in any part of the United States of any article * * * imported * * * into the United States * * *."[33]

But passing that question, and assuming that the anti-price-fixing decisions under

lator, if he were present, would admit, and, had he known it, would have put in the statute."

See Usatorre v. The Victoria, 2 Cir., 172 F.2d 434, 439–441, and notes; Commissioner of Internal Revenue v. Beck's Estate, 2 Cir., 129 F.2d 243, 245 note 4; McAllister v. Commissioner, 2 Cir., 157 F.2d 235, 237, 240 note 6, dissenting opinion; Slifka v. Johnson, 2 Cir., 161 F.2d 467, 470.

30. Plowden, after quoting Aristotle, said that, in such a case "it is a good way * * * to suppose that the lawmaker is present, and that you have asked him the question * * * then you must give yourself such an answer as you imagine he would have done, if he had been present." See Plowden's comments on Eyston v. Studd, 2 Plowden, 450, 465–467, 75 Eng.Rep. 688, 695–696 (1574).

See discussion in Usatorre v. The Victoria, 2 Cir., 172 F.2d 434, 440–441

and notes 12–16; N. L. R. B. v. National Maritime Union, 2 Cir., 175 F.2d 686, 690 and notes 4 and 7.

31. Harris v. Commissioner, 2 Cir., 178 F.2d 861, 864.

32. See, e. g., Markham v. Cabell, 326 U. S. 404, 409, 66 S.Ct. 193, 90 L.Ed. 165; Holy Trinity Church v. U. S., 143 U. S. 457, 12 S.Ct. 511, 36 L.Ed. 226; McGhee v. U. S., 2 Cir., 154 F.2d 101, 105; Walling v. Connecticut Co., 2 Cir., 154 F. 2d 552; Elizabeth Arden, Inc., v. F. T. C., 2 Cir., 156 F.2d 132, 134; Commissioner of Internal Revenue v. Union Pacific Railroad Company, 2 Cir., 188 F.2d 950.

33. As I have already pointed out above, this language expressly banned contracts aimed at increasing the price of imported articles long before the anti-price-fixing decisions of the Supreme Court under the Sherman Act.

the Sherman Act apply here, the controlling inquiry then becomes the present state of vigor of the doctrine of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. The rationale of that doctrine is not easily discerned. For, obviously, a threat of withholding further supplies will coerce price maintenance just about as well as a forthright agreement to maintain a price. The difference, for practical purposes, is shadowy. Judge Denison, in Toledo Pipe-Threading Mach. Co. v. Federal Trade Commission, 6 Cir., 11 F.2d 337, 341, after observing that "every such system as described in the Colgate Case becomes well known to all concerned, and * * * every jobber who buys knows that his right to reorder is dependent upon his observance of the [price] schedule," added that "any distinction between a contract that the jobber will maintain prices and an understanding that he will suffer a penalty if he does not is not strikingly apparent * * *."

Considering the course of Supreme Court anti-trust decisions on the subject of price-fixing since Colgate was decided,[34] it seems to me that, although that doctrine may not be wholly dead, yet, by distinctions stopping just short of extinction, it has been reduced to almost imperceptible proportions. The lower courts have been much puzzled in trying to ascertain just what those shrunken proportions are.[35] But it would seem that almost anything more than a bare refusal to sell to price-cutters will constitute illegal price-fixing.[36] Here we have something palpably more: (1) The defendant's agent testified that defendant had a general program of cutting off price-cutters; (2) defendant promised the plaintiff to adhere to that program, thereby adding an ingredient of agreement not present in the Colgate case;[37] (3) to make that program effective, defendant further agreed to limit the distributors of its product in plaintiff's area to the plaintiff and one other.

Particularly in this case should Colgate not govern. For (as noted above) the defendant had a monopoly (called an "exclusive agency") of the right to make sales to wholesalers in Massachusetts of a special brand of imported whisky. To hold it legal for defendant to contract with plaintiff to refuse to sell further supplies of that monopolized brand to other wholesalers in the state, unless they had maintained a price agreed upon with plaintiff,

34. See e. g., F. T. C. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307; U. S. v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L. Ed. 700; Ethyl Gasoline Corp. v. U. S., 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852; U. S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; U. S. v. Univis Lens Co., 316 U. S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; U. S. v. Bausch & Lomb Co., 321 U.S. 707, 64 S.Ct. 805, 88 L. Ed. 1024; U. S. v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L. Ed. 951; American Tobacco Co. v. U. S., 328 U.S. 781, 808, 66 S.Ct. 1125, 90 L.Ed. 1575; Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259.

35. Toledo Pipe-Threading Mach. Co. v. F. T. C., 6 Cir., 11 F.2d 337; Moir v. F. T. C., 1 Cir., 12 F.2d 22; Q. R. S. Music Co. v. F. T. C., 7 Cir., 12 F.2d 730; J. W. Kobi Co. v. F. T. C., 2 Cir., 23 F.2d 41; Hills Bros. v. F. T. C., 9 Cir., 9 F.2d 481; Shakespeare Co. v. F. T. C., 6 Cir., 50 F.2d 758; Refusals to Sell and Public Control of Competition, 58 YaleL.J. 1121 (1949).

36. F. T. C. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307; U S. v. Bausch & Lomb Co., 321 U.S. 707, 722–723, 64 S.Ct. 805, 88 L.Ed. 1024. See also the cases cited in the next preceding footnote. Professor Chafee says: "In short, the Supreme Court in the Beech-Nut case has virtually declared illegal all effective methods of exercising the right which it unanimously approved in the Colgate case." Equitable Servitudes on Chattels, 41 Harvard L.R. 945, 991. See also Timberg, Liberty of Contract—The "Rights" of Customer-and-Seller Selection, in Business Practices Under Federal Anti-Trust Laws (CCH, 1951).

37. Cf. 250 U.S. 300, 307, 39 S.Ct. 465, 468: " * * * the indictment does not charge Colgate & Co. with selling its products to dealers under agreements which obligated the latter not to resell except at prices fixed by the company."

is to build a smooth path for those who want to detour the anti-trust laws.

6. *Restitution should be withheld here where illegality is clearly shown, and where plaintiff seeks rescission precisely because the illegal condition has been breached.*

Finally, my colleagues argue that even if there was illegality, (1) defendant had the "burden of pleading and proving" illegality, and (2) the illegality did not prevent rescission by the plaintiff because the illegal part of the agreement was still "executory." I think both arguments untenable:

(1) Where a plaintiff not only alleges but proves that an agreement is illegal, surely a court cannot justify itself in ignoring the illegality by saying that the defendant did not allege and prove it. Nor can it be argued tenably that, because the defendant in its pleadings and proof, denied the making of the illegal promise, the defendant is estopped to urge the illegality which the plaintiff's proof reveals. Since an agreement not to assert illegality is itself illegal, an estoppel to assert it is equally ineffective.[38] It is well settled that a court, of its own motion, must refuse to aid a party to an illegal agreement, if the refusal to lend such aid is likely to deter others from entering into such agreements, and if the prevalence of that kind of illegal conduct is not of a minor character but is socially harmful in an important way according to current standards.[39] "Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection, would be tainted with the vice of the original contract, and void for the same reason. Wherever the contamination reaches, it destroys." [40]

(2) I think my colleagues have misconstrued the rulings allowing restitution where an illegal contract is still "executory." The cases hold that a party who has paid money or other consideration for an illegal promise, but who (a) repents of the illegality before the promise is performed and (b) because of the very illegality, rescinds and asks recovery of the consideration, will be granted restitution, if the policy behind the prohibition of the illegal conduct will best be served by such restitution.[41] The facts here are

38. Coppell v. Hall, 7 Wall. 542, 558, 19 L.Ed. 244; McMullen v. Hoffman, 174 U.S. 639, 658, 19 S.Ct. 839, 43 L.Ed. 1117; Pope Mfg. Company v. Gormully, 144 U.S. 224, 234–236, 12 S.Ct. 632, 36 L.Ed. 414; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; United States v. Andrews, 240 U.S. 90, 95–96, 36 S.Ct. 349, 60 L. Ed. 541; Nachman Spring-Filled Corporation v. Kay Mfg. Co., 2 Cir., 139 F.2d 781, 783–784; E. E. Taenzer & Co. v. Chicago, R. I. & P. Ry. Co., 6 Cir., 191 F. 543, 551; Forbes v. City of Ashland, 246 Ky. 669, 55 S.W.2d 917, 921. See Restatement of Contracts § 600, comment a: "The defendant cannot waive the defense if he wishes to do so."

39. McMullen v. Hoffman, 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117; Oscanyan v. Winchester Arms Co., 103 U.S. 261, 26 L.Ed. 539; Coppell v. Hall, 7 Wall. 542, 19 L.Ed. 244; Fitzsimmons v. Eagle Br. Co., 3 Cir., 107 F.2d 712, 126 A.L.R. 681; Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781, 783; 2 Moore, Federal Practice (2d ed.) at p. 1696; Corbin, Contracts, Sections 1460,

1533; Williston, Contracts (Rev. ed.) § 1630 A. Cf. Mercoid Corporation v. Mid-Continent Co., 320 U.S. 661, 670, 64 S.Ct. 268, 88 L.Ed. 376.

See Restatement of Contracts § 600, comment a: "Illegality, if of a serious nature, need not be pleaded. If it appears in evidence the court of its own motion will deny relief to the plaintiff * * * Indeed, if the court suspects illegality, it may examine witnesses and develop facts not brought out by the parties, and thereby establish illegality that precludes recovery by the plaintiff."

The "very meaning of public policy is the interest of others than the parties, and that interest is not to be at the mercy of the defendant alone"; Beasley v. Texas & Pacific Railway Co., 191 U.S. 492, 498, 24 S.Ct. 164, 166, 48 L.Ed. 274. (per Holmes, J.).

40. Coppel v. Hall, 7 Wall. 542, 558–559, 19 L.Ed. 244.

41. See Corbin, Contracts, § 1541; Williston, Contracts (Revised ed.) § 1788.

very different: According to plaintiff's own allegations and proof, the defendant's illegal promise was a primary and integral part of the consideration which induced plaintiff to enter into the agreement. The plaintiff did not rescind because it repented the illegal bargain, and because of the illegality. On the contrary (as plaintiff's pleadings and proof show) one of the two reasons assigned by plaintiff for rescinding—and upon which plaintiff insisted throughout the trial—was precisely that defendant had not performed the illegal promise. Corbin, Contracts, § 1541, patly describes this case when he writes: "The plaintiff's action can scarcely be regarded as bona fide repentance if it comes only after attainment of the unlawful purpose is already seen to be impossible." An illustration will help here: Suppose a plaintiff paid a defendant $10,000. for the defendant's promise to commit perjury; that defendant went back on his promise; and that the plaintiff then sought return of the money because of defendant's breach of his promise. Plainly no court would decide in such a plaintiff's favor.

National Bank & Loan Co. v. Petrie, 189 U.S. 423, 23 S.Ct. 512, 513, 47 L.Ed. 879, cited by my colleagues, is not in point. There the defendant had used fraud to induce the plaintiff to enter into an illegal contract. The Court, in upholding a decision for the plaintiff, expressly said that it was not so deciding because of plaintiff's repentance of the illegality, but solely because the fraud was "anterior to and independent of the contract."

7. As Corbin, § 1534, says, among the factors to be considered in determining whether restitution should be granted "are the degree of criminality or evil, the comparative innocence or guilt of the parties, the extent of the public harm involved, the moral quality of the conduct of the parties, and the penalty or forfeiture that will result from refusal of relief * * * The public interest may be such that the plaintiff is denied a remedy even though the defendant (an equally guilty man) is left in the enjoyment of his ill-gotten gains."[42]

So that the real issue here boils down to whether a sufficiently grave policy against illegality is here involved. I submit that, in the light of the plain language of Section 73 of the Wilson Act and of Supreme Court anti-price-fixing decisions under the Sherman Act, the anti-trust policy of condemning price-fixing is grave enough to preclude restitution to a plaintiff who bought goods on the condition that the seller would violate that policy. As Corbin says (§ 1521, p. 1006): "If the bargaining parties were engaged in a conspiracy to create a monopoly, made criminal by statute, refusal of all remedy may be justified."

---

In Eastern Expanded Metal Co. v. Webb Granite & Const. Co., 195 Mass. 356, at page 363, 81 N.E. 251, 252, the court referred to a situation where a contract is executory "and is disaffirmed because of its illegality".

42. See Restatement of Restitution § 140: "A person may be prevented from obtaining restitution for a benefit because of his criminal or other wrongful conduct in connection with the transaction on which his claim is based.

Comment: a. * * * If relief is denied, it is because of the desirability of protecting public interests, which may require a denial of relief even though, as between the parties, there is both unjust deprivation and unjust enrichment. The result can be justified only on the ground that it tends to prevent such transactions or that the public should not be burdened with the expense of adjusting such claims. * * *

b. Factors. No definite rule can be stated which will determine in all cases whether restitution will or will not be granted since the courts consider all the circumstances involved in the particular case. Among the factors which are or may be of importance in determining whether restitution will be granted are the following: (1) whether the complainant's conduct involved serious moral turpitude; (2) the closeness of the wrongful conduct to the transaction; (3) whether the complainant was in a superior or subservient position to the recipient; (4) how great a forfeiture would ensue from a failure to give relief; (5) whether a denial of relief would tend to discourage similar illegal transactions."